8
J. RUSSELL CUNNINGHAM, SBN 130578
J. LUKE HENDRIX, SBN 271424
GABRIEL P. HERRERA, SBN 287093
NABEEL M. ZUBERI, SBN 294600
DESMOND, NOLAN, LIVAICH & CUNNINGHAM
1830 15th Street
Sacramento, California 95811
Telephone: (916) 443-2051
Facsimile: (916) 443-2651

Attorneys for Sheri L. Carello
Chapter 7 Trustee

# UNITED STATES BANKRUPTCY COURT

## EASTERN DISTRICT OF CALIFORNIA

### SACRAMENTO DIVISION

| | |
|---|---|
| In re:<br><br>GRAIL SEMICONDUCTOR, a California corporation,<br><br>Debtor. | Case No.: 15-29890-D-7<br>Chapter 7 |
| Sheri L. Carello, in her capacity as Trustee for the Bankruptcy Estate of Grail Semiconductor, a California corporation,<br><br>Plaintiff,<br><br>vs.<br><br>DONALD STERN, BILLIONAIRE HOPE INTERNATIONAL, LTD., MOM OS, LLC, FRANK BAUDER, THE HONGKONG AND SHANGHAI BANKING CORPORATION LTD.,<br><br>Defendants. | Adversary No. 16-02088<br><br>DNL-2<br><br>Date: June 15, 2016<br>Time: 10:00 a.m.<br>Place: 501 I Street, 6th Floor<br>Courtroom 34<br>Sacramento, CA 95814 |

1

# MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF APPLICATION FOR RIGHT TO ATTACH ORDER AND ORDER FOR ISSUANCE OF WRIT OF ATTACHMENT

Plaintiff Sheri L. Carello ("Trustee"), in her capacity as the Chapter 7 trustee for the bankruptcy estate of GRAIL SEMICONDUCTOR, a California corporation ("Debtor"), submits the following memorandum of points and authorities in support of her application after hearing for a right to attach order and writ of attachment that attaches to DONALD STERN'S ("Stern") and BILLIONAIRE HOPE INTERNATIONAL, LTD.'S ("BHI") account in the amount of $2.75 million with THE HONGKONG AND SHANGHAI BANKING CORPORATION LTD. ("HSBC").

## FACTUAL BACKGROUND

1. On December 30, 2015 ("Petition Date"), the Debtor commenced the above-captioned bankruptcy case by filing a voluntary Chapter 11 petition and on April 22, 2016, the case was converted to Chapter 7. The Trustee is the duly appointed Chapter 7 trustee.

2. In January 2000, the Debtor was incorporated by cousins Stern and Robert Stern as a startup company in order to market new technology in memory chip design invented by Stern.

3. In an effort to produce the technology, on or about April 19, 2001, the Debtor and Stern met with two representatives of Mitsubishi Electric & Electronics USA, Inc. ("Mitsubishi") along with representatives of Global Alliance and Asia Star Ventures. During the meeting, Stern provided a presentation describing the new technology. The information disclosed at the meeting was protected by a nondisclosure agreement executed by, among others, Mitsubishi.

4. The Debtor's and Stern's efforts did not culminate in any outside investment or product development. In June 2004, Stern learned of new chip technology being promoted through a joint venture between Mitsubishi Electric Company, the parent company of Mitsubishi, and Hitachi, Ltd. Stern believed that Mitsubishi disclosed the information it was provided during his presentation and that the joint venture was incorporating the Debtor's technology in violation of the nondisclosure agreement.

5.   In June 2007, the Debtor sued Mitsubishi commencing *Grail Semiconductor, Inc. v. Mitsubishi Electric & Electronics USA, Inc.*, Case No. 1-07-CV-098590 (Sup. Ct. Cal., Santa Clara Cty.) ("State Court Case"). In its complaint, the Debtor alleged, among other causes of action, misappropriation of trade secrets, unfair competition, and breach of contract. By trial, in 2012, the Debtor alleged a single cause of action for breach of contract and sought damages, injunctive and declaratory relief, and a constructive trust.

6.   After five years of litigation, the Debtor obtained a jury verdict in the approximate amount of $124 million. That award was set aside when the trial court granted Mitsubishi's motion for a new trial as to damages only – Mitsubishi's motion for a judgment notwithstanding the verdict was denied. The parties filed cross appeals and in April 2014, the California Court of Appeals affirmed the trial court's decision.

7.   During a mediation that occurred on the eve of retrial of the damage award, on October 5, 2015, the Debtor and Mitsubishi entered into a settlement agreement that provided for a $55 million payment to the Debtor ("Settlement Funds").

8.   At the time of the settlement, the Debtor's liabilities exceeded its assets as the Settlement Funds would not be enough to meet the obligations of all of the Debtor's creditors after accounting for litigation fees and costs. In addition, the Debtor did not and does not have any other business operations.

9.   Stern, who was a director for the Debtor at the time of the settlement, knew that the Settlement Funds would not be enough to meet the Debtor's obligations. The directors and the officers of the Debtor knew about creditors' claims and had a spreadsheet prepared to assist with assessing whether a certain settlement amount was feasible to pay the Debtor's claims. Numerous scenarios were performed to determine whether claimants would have to start taking deductions in order to make a settlement work. Despite knowing that the Settlement Funds would not be enough, Stern agreed to vote in favor of the settlement.

10. On October 9, 2015, the Settlement Funds were remitted to the Debtor's counsel in the State Court Case.

11. On or about October 13, 2015, at Stern's direction, approximately $2.75 million ("Transferred Funds") was posted to an account held by Stern and BHI, a sham company of Stern organized under the laws of the British Virgin Islands. The Transferred Funds were monies taken directly from the Settlement Funds and deposited into an account held with THE HONGKONG AND SHANGHAI BANKING CORPORATION LTD. ("HSBC"). Portions of the Transferred Funds were transferred by Stern to Frank Bauder ("Bauder") in the amount of $250,000 and MOM OS LLC ("MOM OS") in the amount of $400,000.

12. The account with HSBC and the transfers to Bauder and MOM OS were discovered after HSBC notified Brad Woods ("Woods"), a former officer of the Debtor, that approximately $2 million in the HSBC account were being transferred out of the account. Woods was informed of the transfer as he assisted Stern in purchasing BHI in 2012 and was a signatory to the account.

13. The transfer of the Transferred Funds was not approved by the Debtor. On October 14, 2015, a special meeting of the board of directors for the Debtor was held in which the board was presented with whether to issue payment to Stern from the Settlement Funds on account of Stern's claim to funds based on an agreement entered into on or about August 1, 2011. The board was deadlocked on whether to authorize payment and the matter was suspended to petition a court for the appointment of a provisional director.

14. The Debtor's schedules reflect that on the Petition Date the Debtor's total assets aggregated $11,596,812.25 and liabilities aggregated $18,744,843.06. The Debtor's Schedule E/F identifies Stern's unsecured claim in the approximate amount of at least $280,000 for a "consulting agreement and board approved expenses."

15. On May 4, 2016, the Trustee commenced the above-captioned adversary proceeding against, among others, BHI and Stern alleging causes of action that included requests

for avoidance and recovery of fraudulent transfers pursuant to California Civil Code Sections 3439.04 & 3439.05 and 11 U.S.C. Sections 544 and 550.

16. In conjunction with this application, the Trustee anticipates filing DNL-1, the Trustee's ex parte application for a temporary protective order. The Trustee also anticipates filing DNL-3 in the parent bankruptcy case, the Trustee's application to employ Mayer Brown JSM ("Special Counsel") as the estate's Hong Kong special counsel to assist with recovering the Transferred Funds and enforcing any order issued by the Court.

## BASIS FOR RELIEF

### A. Federal Rule 64

Pursuant to Federal Rule of Civil Procedure 64, as incorporated by Federal Rule of Bankruptcy Procedure 7064, "all remedies providing for seizure of person or property for the purpose of securing satisfaction of the judgment ultimately to be entered in the action are available under the circumstances and in the manner provided by the *law of the state which the district court is held* ...." Fed. R. Civ. P. 64 (emphasis added). "The effect of Rule 64 is to incorporate state law to determine the availability of prejudgment remedies for seizure of property to secure satisfaction of a judgment ultimately entered." *Pos-A-Traction, Inc. v. Kelly-Springfield Tire Co.*, 112 F.Supp. 2d 1178, 1181 (C.D. Cal. 2000).

### B. Right to Attach Order and an Order for Issuance of Writ of Attachment

Under California law, a plaintiff may seek to obtain a writ of attachment. A writ of attachment allows a plaintiff, in certain prescribed instances, to obtain a pre-trial seizure of the property of a defendant-debtor. *Whitehouse v. Six Corp.*, 40 CalApp.4th 527, 603 (1995). A plaintiff who suspects that the defendant-debtor has fraudulently transferred assets in order to become judgment proof may also enforce its claim against the transferred property by way of writ of attachment. *Id.*; see also Civil Code Section 3439.07.

To obtain an attachment, a party must demonstrate that: (a) the claim upon which the application for attachment is based is one upon which an attachment may be issued; (b) the plaintiff has established the probable validity of the claim upon which the application for

5

attachment is based; (c) the order is not sought for a purpose other than the recovery upon the claim upon which the application for attachment is based; and (d) the amount to be secured by the attachment is greater than zero. Cal. Code Civ. Proc. Section 484.090.

*a. The claim is one in which the application may be issued.*

An attachment is proper "only in an action on a claim or claims for money, each of which is based upon contract," unless otherwise provided by statute. Cal. Code Civ. Proc. Section 483.010(a). Civil Code Section 3439.07 in turn provides that a creditor in an action for relief against a transfer may obtain "[a]n attachment or other provisional remedy against the asset transferred or its proceeds in accordance with the procedures described in Title 6.5 (commencing with Section 481.010) of Part 2 of the Code of Civil Procedure."

Here, in the underlying adversary proceeding, the Trustee seeks avoidance and recovery of the $2.75 million that was fraudulently transferred, on account of the Settlement Funds, to Stern and BHI and was deposited into an HSBC account in the name of Stern and BHI under California Civil Code Section 3439.04 & 3439.05 and 11 U.S.C Sections 544 and 550. As such, the claim is one in which the application may be issued.

*b. The Trustee has established the probable validity of the claim.*

Cal. Code Civ. Proc. Section 486.020 requires a plaintiff to establish "the probable validity of the claim upon which the application for attachment is based." "Probable Validity" requires the plaintiff to show that "it is more likely than not that the plaintiff will obtain a judgment against the defendant on that claim." Cal. Code Civ. Proc. Section 481.190. Further, a court is only required to make a preliminary determination of the outcome of the litigation. *Lorber Industries of California v. Turbulence, Inc.*, 175 Cal.App.3d 532, 535 (1985). The showing of a prima facie case for recovery will suffice for the issuance of a right to attach order and writ of attachment. *Id.*

The Trustee has demonstrated that it is more probable than not that she would obtain a judgment against the defendants on her claims under Civil Code Sections 3439.04 & 3439.05

6

and 11 U.S.C. Sections 544 and 550.  With respect to Section 3439.04, Stern and BHI were transferred the Transferred Funds with actual intent to hinder, delay or defraud an entity to which the Debtor was, or became, on or after the date of the transfer was made, indebted.  As demonstrated above, the transfer was made within four years of the Petition Date, the transfer of the Transferred Funds was made to an insider of the Debtor, the transfer was made at Stern's behest, in his capacity as a director for the Debtor, without receiving prior approval, the transfer was not disclosed to the other directors and officers prior to the transfer, the transfer was concealed from the other directors and officers, and the Debtor was insolvent at the time of the transfer or shortly thereafter (the transfer was made within 90 days of filing the petition).  Stern knew there were other claims to the Settlement Funds and the Transferred Funds, yet, took the funds and placed them in a foreign account in an attempt to place them out of the reach of other claimants.  Moreover, the Debtor did not receive anything in exchange for the transfers.

With respect to the Trustee's claim under Section 3439.05, the Debtor received less than reasonably equivalent value in exchange for the transfer of the Transferred Funds, and the Debtor was insolvent on the date the said transfer was made, or became insolvent as a result of said transfer (the transfer occurred within 90 days of filing of the petition).  The Transferred Funds exceed the amount and value of Stern's claims, and the Debtor's liabilities exceeded its assets at the time of the transfer.  Indeed, interested parties had a spreadsheet prepared to assist with assessing whether a certain settlement amount was feasible to pay the Debtor's claims and knew that the Settlement Funds were not enough to satisfy all claims.  Further, the transfer was made within four years of the Petition Date and the Debtor was indebted to several creditors, which amounts remain unpaid.

    *c. The order is not sought for another purpose.*

The Trustee only seeks the order to recover upon the claim upon which the application for attachment is based.  The Trustee only seeks to protect the estate's creditors from further

7

dissipation of the Transferred Funds and to ensure that the location of the funds are known and available.

        *d. The amount sought for attachment is greater than zero.*

The funds transferred to Stern and BHI in which the Trustee seeks recovery and an attachment amounts to $2,750,000. A such, the attachment is for an amount greater than zero.

    **C.**    **The Trustee is Excused from the Undertaking**

Before the issuance of a writ of attachment, "the plaintiff shall file an undertaking to pay the defendant any amount the defendant may recover for any wrongful attachment by the plaintiff in the action." Cal. Code Civ. Proc. Section 489.210. The undertaking is typically $10,000, however, the Trustee is excused from posting an undertaking. See Section 489.220; see also FRBP 7065. Under Federal Rule of Bankruptcy Procedure 7065, a restraining order may be issued on application by a trustee without compliance with Rule 65(c), which provides for security in the event a party is wrongfully enjoined or restrained. As such, the Trustee should be excused from the undertaking.

## CONCLUSION

Based on the foregoing, the Trustee has made a prima facie case under Civil Code Sections 3439.04 & 3439.05 and 11 U.S.C. Sections 544 and 550, and this is a proper situation for the issuance of a writ of attachment. As such, the Trustee's application should be granted.

Dated: May 12, 2016        **DESMOND, NOLAN, LIVAICH & CUNNINGHAM**

By: _____
**J. RUSSELL CUNNINGHAM**
Attorneys for Sheri L. Carello
Plaintiff/Chapter 7 Trustee

8