5
J. RUSSELL CUNNINGHAM, SBN 130578
J. LUKE HENDRIX, SBN 271424
GABRIEL P. HERRERA, SBN 287093
NABEEL M. ZUBERI, SBN 294600
DESMOND, NOLAN, LIVAICH & CUNNINGHAM
1830 15th Street
Sacramento, California 95811
Telephone: (916) 443-2051
Facsimile: (916) 443-2651

Attorneys for Sheri L. Carello
Chapter 7 Trustee

# UNITED STATES BANKRUPTCY COURT

## EASTERN DISTRICT OF CALIFORNIA

### SACRAMENTO DIVISION

| | |
|---|---|
| In re:<br><br>GRAIL SEMICONDUCTOR, a California corporation,<br><br>Debtor. | Case No.: 15-29890-D-7<br>Chapter 7 |
| Sheri L. Carello, in her capacity as Trustee for the Bankruptcy Estate of Grail Semiconductor, a California corporation,<br><br>Plaintiff,<br><br>vs.<br><br>DONALD STERN, BILLIONAIRE HOPE INTERNATIONAL, LTD., MOM OS, LLC, FRANK BAUDER, THE HONGKONG AND SHANGHAI BANKING CORPORATION LTD.,<br><br>Defendants. | Adversary No. 16-02088<br><br>DNL-2 |

### DECLARATION OF BRAD WOODS

I, Brad Woods, declare as follows:

1

1. I am a certified public accountant and have been for approximately 35 years. I was employed by Arthur Andersen LLP and in or about 1992, I started my own consulting and accounting firm. In addition, I have been employed as the Chief Executive Officer and Chief Financial Officer for a corporation in Beijing, China. I was the Chief Financial Officer, Secretary, and Treasurer for GRAIL SEMICONDUCTOR, a California Corporation ("Debtor"), since about March 1, 2012. As a result of my position with the Debtor, I was intimately involved and had first-hand knowledge of the financial condition of the Debtor and its operations.

2. Unless stated otherwise, I have personal knowledge of each of the facts set forth in this declaration, and if called to testify as a witness, I could and would competently do so.

3. When I was appointed as the CFO for the Debtor, litigation was pending in Santa Clara County known as *Grail Semiconductor, Inc. v. Mitsubishi Electric & Electronics USA, Inc.*, Case No. 1-07-CV-098590 (Sup. Ct. Cal., Santa Clara Cty.) ("State Court Case"). The State Court Case was commenced by the Debtor against Mitsubishi Electric & Electronics USA, Inc. ("Mitsubishi"). I understand that the State Court Case was commenced after Donald Stern ("Stern") learned of new chip technology being promoted through a joint venture between Mitsubishi Electric Company, the parent company of Mitsubishi, and Hitachi, Ltd. The new chip technology was believed to have been incorporating information that was disclosed by Stern during a presentation that was the subject of a nondisclosure agreement.

4. In May 2012, the Debtor obtained a jury verdict in the approximate amount of $124 million. While Mitsubishi's motion for a judgment notwithstanding the verdict was denied, the jury award was set aside when the trial court granted Mitsubishi's motion for a new trial as to damages only. Cross appeals were filed and in April 2014, the California Court of Appeals affirmed the trial court's decision.

5. On the eve of the retrial of the damage award, a mediation between the Debtor and Mitsubishi occurred. I participated in the mediation.

6. Prior to the mediation, there were various discussions between interested parties of the Debtor, including Ray Niro, Richard Gilbert, Ronald Hofer, Stern, Robert Stern, and myself, regarding creditors' claims asserted against the State Court Case and any resulting proceeds. We each knew about the creditors' asserted claims and had a spreadsheet prepared to assist us with assessing whether a certain settlement amount was feasible to pay the claims, assuming the particular claim was valid. We performed numerous scenarios to determine whether claimants would have to start taking deductions in order to make settlement work. Stern had access to the spreadsheet and would have seen it. Stern was involved enough with these discussions and interactions to know whether a particular settlement amount was feasible or when reductions would have to be made to make a settlement work.

7. During the mediation, $55 million was being discussed as a possible settlement amount. Based on our numerous calculations and spreadsheets, Ray Niro, Richard Gilbert, Ronald Hofer, Stern, Robert Stern, and I knew that $55 million would not be enough to satisfy the Debtor's debt obligations and the claims asserted against the State Court Case and any resulting proceeds. There was a discussion, which included Stern, the topic of which was the fact that $55 million would not be enough to satisfy the Debtor's obligations. However, it was agreed that if reductions were made the $55 million could work. Certain creditors did agree to reduce their claims, albeit orally, and it was understood that further reductions would have to be made by other claimants. This resulted in the settlement of $55 million to be agreed upon.

8. I understand that the $55 million settlement was sent to the Debtor's counsel. Despite there being no approval for disbursements and knowing that reductions would have to be made, I learned that money was wired to Stern. Stern was not authorized to be disbursed money and certainly was not authorized to take $2.75 million. I did not learn of the $2.75 million transfer to Stern until early 2016. At the time of the transfer, I do not believe anyone else was aware of the $2.75 million transfer, other than possibly Richard Gilbert and Ray Niro.

9. In about March 2016, I learned that the $2.75 million wired to Stern, on account of the settlement funds, was deposited into a HONGKONG AND SHANGHAI BANKING

3

CORPORATION LTD. ("HSBC") account in the name of Billionaire Hope International Ltd. ("BHI"). I learned this information when HSBC contacted me to inform me of a large transfer that was going to be made from the BHI account, which I was a signatory to because I helped Stern open the account in 2012.

10. In the spring of 2012, I traveled to Hong Kong to form Grail Semiconductor Ltd., which was intended to be an affiliate of the Debtor. During this time, Stern was living in the Philippines and decided to make the short trip to Hong Kong to go through the motions of forming the affiliate. While we were in Hong Kong, Stern asked for help with obtaining his own BVI entity. I assisted him with locating entities with which he could purchase and he ultimately chose BHI. At that time, we were both named as 50-50 shareholder and split all costs. In addition, a joint account was created, which was the account that the $2.75 million was deposited, and the understanding was made that I would be giving my rights to BHI to Stern later. It is my understanding that BHI was never used for any business operations.

11. In late 2014 and early 2015, Stern and I went through the process of transferring my interest in BHI to Stern. Apparently, however, Stern did not remove me from the joint account, which resulted in me being notified of the large transfer in March 2016.

12. I also learned that $400,000, of the $2.75 million, was transferred to MOM OS LLC and $250,000, of the $2.75 million, was transferred to Frank Bauder ("Bauder"). Bauder is a former director of the Debtor and was a director until at least April 2015. Bauder would have known that the money transferred to him came from settlement of the State Court Case.

I declare under penalty of perjury under the laws of the State of California, that the foregoing is true and correct.

Executed this 5th day of May 2016, at Frisco, Colorado.

_____
BRAD WOODS

4