**25**

**J. RUSSELL CUNNINGHAM, State Bar #130578**
**J. LUKE HENDRIX, State Bar #271424**
**GABRIEL P. HERRERA, State Bar #287093**
**NABEEL ZUBERI, State Bar # 294600**
**DESMOND, NOLAN, LIVAICH & CUNNINGHAM**
1830 15th Street
Sacramento, California  95811
Telephone: (916) 443-2051
Facsimile: (916) 443-2651

Attorneys for Sheri L. Carello
Chapter 7 Trustee

## UNITED STATES BANKRUPTCY COURT

## EASTERN DISTRICT OF CALIFORNIA

## SACRAMENTO DIVISION

| | |
|---|---|
| In re:<br><br>GRAIL SEMICONDUCTOR, a California corporation,<br><br>Debtor. | Case No.: 15-29890-D-7<br>Chapter 7 |
| Sheri L. Carello, in her capacity as Trustee for the Bankruptcy Estate of Grail Semiconductor, a California corporation,<br><br>Plaintiff,<br><br>vs.<br><br>DONALD STERN, BILLIONAIRE HOPE INTERNATIONAL, LTD., MOM OS, LLC, FRANK BAUDER, THE HONGKONG AND SHANGHAI BANKING CORPORATION LTD.,<br><br>Defendants. | Adversary No. 16-02088<br><br>DNL-2<br><br>Date:   June 15, 2016<br>Time:   10:00 a.m.<br>Place:  501 I Street, 6th Floor<br>          Courtroom 34<br>          Sacramento, CA 95814 |

## EXHIBITS IN SUPPORT OF APPLICATION FOR RIGHT TO ATTACH ORDER AND ORDER FOR ISSUANCE OF WRIT OF ATTACHMENT

1

Attorney J. Russell Cunningham submits the following exhibit in support of application for right to attach order and order for issuance of writ of attachment:

| EXHIBIT | DESCRIPTION | PAGE NO. |
|---------|-------------|----------|
| A | Board minutes from the special meeting of the board of directors | 3 - 8 |
| B | October 20, 2015 letter Raymond P. Niro of Niro Haller & Niro and John C. Oehmke of Diepenbrok Elkin LLP | 9 - 10 |
| C | October 29, 2015 follow up letter to John C. Oehmke of Diepenbrok Elkin LLP | 11 - 12 |
| D | Grail Semiconductor, Inc. v. Mitsubishi Electric & Electronics USA, Inc., Case No. 1-07-CV-098590 Court of Appeals decision | 13 - 23 |
| E | Correspondence between HSBC and Woods evidencing the transfers | 24 - 25 |

Dated: May 1?, 2016

**DESMOND, NOLAN, LIVAICH & CUNNINGHAM**

By: _____

**J. RUSSELL CUNNINGHAM**
Attorneys for Sheri L. Carello,
Plaintiff/ Chapter 7 Trustee

2

# GRAIL SEMICONDUCTOR, INC.
## MINUTES OF SPECIAL MEETING
## OF BOARD OF DIRECTORS

A special meeting of the Board of Directors of this corporation was held on October 14, 2015 at 3:15 p.m. at the Resolution Arts Building, 2630 J Street, Sacramento, California 95816 pursuant to a written Notice of Special Meeting of the Board of Directors called by Directors Richard Gilbert and Donald Stern pursuant to Sections 3.11 and 3.12. of the corporation's Bylaws (a copy of said Notice is attached hereto).

| | |
|---|---|
| Directors physically present: | Donald Stern<br>Richard Gilbert |
| Directors telephonically present: | Robert Stern |
| Directors absent: | None |
| Others physically present: | Ray Niro, Esq. (Litigation counsel for the Company in the MEUS matter), Ronald Hofer, CEO, Brad Woods, CFO/Secretary, Elizabeth Stallard, Esq. (Personal counsel for Mr. Hofer), Paul Aronowitz, Esq. (Personal counsel for Mr. Gilbert), Timothy A. Charshaf, Esq. (Counsel for the corporation) |
| Others telephonically present: | Edward Klein, Esq. and Ashley Yeargan, Esq. (Personal counsel for Robert Stern) |

No chairman was elected. The full Board of Directors attended the meeting.

The following matters were discussed and acted upon at this meeting:

The first matter before the Board was the discussion of whether or not to grant the request of the CFO/Secretary to tape record the meeting. A full discussion of the possible criminality and legal prudence associated with such recordings was had by the Board. Upon motion duly made, seconded and approved, it was:

RESOLVED: The tape recording of the meeting was disallowed and it was requested that all tape recorders be removed from the meeting room. Mr. Charshaf was charged with being the Recording Secretary, to take handwritten notes of the meeting and to thereafter prepare minutes reflecting the actions and resolutions taken at the meeting.

The second matter before the Board was the discussion of whether or not to ratify the settlement agreement reached in *Grail Semiconductor, Inc. vs. Mitsubishis Electric & Electronics USA, Inc., Santa Clara County Superior Court, Action No. 01-07-CV-098590* (the "Lawsuit"). A discussion of the facts and circumstances, including a detailed presentation of the case from the corporation's lead trial counsel, Ray Niro, Esq., and the review of confidential, written case-analysis from Mr. Niro to the corporation, was had by the entire Board (Attached). Mr. Niro, the CEO, his counsel and the CFO/Secretary were thereafter asked to leave the meeting room to allow the board to review and fully discuss the matter. After discussion and upon motion duly made, seconded and unanimously approved, it was:

# Exhibit A

3

RESOLVED: The settlement reached in the Lawsuit was ratified.

Prior to addressing the remainder of the agenda Director Gilbert offered to preliminarily discuss the remaining meeting agenda items. A general discussion by the Board about those agenda items followed. A recess was taken and the CEO Hofer presented the Board with a letter that he had hand-delivered to Mr. Niro during the recess concerning Mr. Niro's fee in *Grail Semiconductor, Inc. vs. Mitsubishis Electric & Electronics USA, Inc., Santa Clara County Superior Court, Action No. 01-07-CV-098590* (the "Hofer Letter"). CEO Hofer requested time with the Board to explain his reasoning for the letter to Mr. Niro. The Board ended the recess and Mr. Niro, the CEO, his counsel and the CFO/Secretary remained outside of the meeting room.

After a brief discussion about the Hofer letter and hearing from Mr. Hofer the Board invited him back into the meeting. The Board allowed Mr. Hofer to fully explain the reasoning and justification behind the letter he drafted and hand delivered to Mr. Niro. The Board asked Mr. Hofer to leave the meeting room after he had concluded his presentation.

The Board then fully discussed the CEO's letter and his explanations for same. Additionally, the Board discussed the ramifications of raising claims such as those asserted in the letter concerning the invalidity of the Niro fee agreement, including the pre-existing agreement of the Niro firm to negotiate a reduction of the fees due. Upon motion duly made, seconded and unanimously approved, it was:

RESOLVED: The Board had not given Mr. Hofer the authority to draft or deliver his letter to Mr. Niro. However, the corporation did affirmatively reserve it rights to assert any available defenses to the payment of the Niro fees available to the corporation in anticipated future negotiations with Mr. Niro regarding his fee relating to the Lawsuit.

FURTHER RESOLVER: That the corporation, through Mr. Charshaf, notify Mr. Niro of its position.

The next matter that then came before the Board was the reaffirmation of prior Board action which Director Donald Stern represented had the effect of limiting any corporate expense of greater than $10,000.00, or for any contract on behalf of the corporation, to be authorized only upon Board approval. The Board further discussed obtaining from the CEO a one-year operating expense budget to be submitted to the Board on or before November 2, 2015. Upon motion duly made, seconded and unanimously approved, it was:

RESOLVED: The Board reaffirms prior Board action which limits any corporate expenditure greater than $10,000.00, or for any contract on behalf of the corporation, to be authorized only upon advance Board approval.

FURTHER RESOLVED: That the CEO is required to submit to the Board a one-year, operating expense budget on or before November 2, 2015.

FURTHER RESOLVED: That the corporation, through Mr. Charshaf, notify the CEO and CFO of these resolutions.

The next matter that came before the Board was the corporation's fee payments to Mr. Niro, First Class Legal (IS) Ltd. ("1CL") and Gerchen Keller Capital, LLC ("GKC"). The Board

fully discussed the following: that Mr. Niro held in his client trust account the sum of $55,000,000.00 as paid by Mitsubishi in settlement of the Lawsuit; that Niro, GKC and 1CL were creditors that held priority claims against the corporation pursuant to security agreements and possible UCC filings; the effect of the filing of an involuntary or voluntary bankruptcy proceeding on behalf of the corporation on those priority claims versus non-priority claimants; the intent to enter into agreements with Mr. Niro and GKC to further negotiate in good faith a reduction of their respective fee claims; proposed letters of intent to be entered into between the corporation and Mr. Niro and GKC; the historical facts and circumstances attendant to the 1CL funding agreements, including 1CL's breach of its funding agreements with the corporation, and related matters. The Board further discussed authorizing Director Gilbert to negotiate with 1CL to settle its claims subject to final Board approval. Upon motion duly made, seconded and unanimously approved, it was:

RESOLVED: The corporation, through Mr. Charshaf, is to direct Ray Niro to pay his firm the sum of $21,450,000.00 and to pay to GKC $12,271,291.00 – both payments to be disbursed out of Mr. Niro's client trust account. The letters of intent to both Mr. Niro and GKC are to be revised to redact any reference to fees or other monies "owed to" or "claimed by" Mr. Niro or GKC. Further corporate negotiations will be had with Mr. Niro and GKC regarding a reduction of the fees paid to them and the anticipated return of a portion of those fees. Director Gilbert is authorized to negotiate with 1CL to settle its claims subject to final Board approval.

Next the Board discussed the corporation's need for a future litigation and an operational reserves in the amount of $2,250,000.00 to be paid from Mr. Niro's client trust account and deposited into Mr. Charshaf's client trust account. Upon motion duly made, seconded and unanimously approved, it was:

RESOLVED: The corporation, through Mr. Charshaf, direct Ray Niro to wire transfer $2,250,000.00 to Mr. Charshaf's client trust account and that said monies shall be used for future litigation and corporate operations only, including but not limited to the payment of fees and reimbursement of costs due Directors and payment of the corporation's attorney's fees.

The seventh matter before the Board was the need to appoint point persons to negotiate with the corporation's remaining creditors any claims they may have. Director Gilbert represented to the Board that GKC had agreed to assist in this regard and to negotiate and pay creditors so designated by the corporation from its own funds (to be later credited back to GKC), after Board approval, and that this procedure would be beneficial to the corporation as GKC could offer immediate payment, upon Board approval, in lieu of the creditor having to wait a prolonged period of time to satisfy its claim or for the need of litigation. The Board also fully discussed the granting of authority to Director Gilbert to negotiate any and all claims against the corporation subject to the Board's approval of any final, proposed terms. Upon motion duly made, seconded and unanimously approved, it was:

RESOLVED: Director Gilbert is authorized to negotiate an arrangement with GKC whereby GKC will be authorized to negotiate claims with certain creditors so designated by the corporation, in cooperation with Director Gilbert, and to pay those creditors only upon Board approval of any final, proposed terms. The corporation will then credit back to GKC any such settlement sum that has Board approval together with any compensation for GKC agreed and approved by the Board. Director Gilbert is authorized to negotiate any and all claims against the corporation subject to the Board's approval of any final, proposed terms.

The Board next had a full discussion of Director Donald's Stern's claim for a payment of a percentage of the total sum paid by Mitsubishi in settlement of the lawsuit. Director Gilbert moved to affirm the percentage payment claimed by Director Donald Stern. Director Donald Stern seconded the motion and a vote was held with Director Donald Stern abstaining from the vote due to his self-interest in the outcome thereof. Director Gilbert voted aye and Director Robert Stern voted nay. There being a deadlock of a quorum of Directors authorized to vote on the matter, the matter was tabled to allow for Director Gilbert to petition a court of competent jurisdiction for the appointment of a provisional director under California Corporations Code Section 308. The Board requested Mr. Charshaf to research the legal issue of whether Director Donald Stern had the legal right to second the motion and report his finding to the Board so Director Gilbert can determine if he will direct Mr. Charshaf to proceed with a petition for a provisional director Upon motion duly made, seconded and unanimously approved, it was:

RESOLVED:  Mr. Charshaf shall research the issue of whether Director Donald Stern had the legal right to second the motion, to report same to the Board and, assuming such act was legal, then Director Gilbert shall petition a court of competent jurisdiction for the appointment of a provisional director under California Corporations Code Section 308.

Next before the Board was the corporation's direction to Mr. Niro to hold the remaining Mitsubishi lawsuit settlement funds in his client trust account until further Board resolution.

Upon motion duly made, seconded and unanimously approved, it was:

RESOLVED:  The corporation, through Mr. Charshaf, direct Ray Niro to hold the remaining Mitsubishi lawsuit settlement funds in his client trust account until further Board resolution.

The Board meeting was continued to resume on November 2, 2015 at a time and location to be determined.

There being no further business to come before the meeting, the same was, on motion duly made, continued to November 2, 2015 at a time and location to be determined.

DATED: October 14, 2015

ATTEST:

Dated: November ___, 2015                    Dated:  November ___, 2015


_____                     _____
Director Richard L. Gilbert                 Director Robert B. Stern

Dated: November ___, 2015                    Dated:  November ___, 2015


_____                     _____
Director Donald S. Stern                    Recording Secretary
                                            Timothy A. Charshaf, Esq.

**Timothy A. Charshaf, Esq.**

| | |
|---|---|
| **From:** | Richard L. Gilbert <richardlgilbert@rgilbertadr.com> |
| **Sent:** | Monday, October 12, 2015 8:07 AM |
| **To:** | Robert Stern; don@donstern.com |
| **Cc:** | Edward A. Klein; Tania H. Colderbank; Ronald Hofer; Timothy Charshaf; Ray Niro; Brad A Woods |
| **Subject:** | Notice of Special Meeting of the Board of Directors of Grail Semiconductor, Inc. |
| **Importance:** | High |

To:                     Donald Stern
                        Robert Stern
                        Donald Hofer
                        Brad Woods

CC:                     Timothy A. Charshaf
                        Raymond P. Niro
                        Edward V. Klein
                        Tania H. Colderbank

This email communication constitutes notice of a Special Meeting of the Board of Directors (the "Board") of Grail Semiconductor, Inc. (the "Company") in accordance with Section 3.11 of the Bylaws of the Company.

In accordance with Section 3.11 of the Bylaws of the Company, the undersigned, Richard L. Gilbert, a member of the Board of the Company and Donald Stern, a member of the Board of the Company, do hereby notice and declare a Special Meeting of the Board to be held on Wednesday, October 14, 2015 at 3 PM at the offices of the undersigned, 2630 J St., Sacramento, CA.
If you are unable to attend in person, kindly provide a telephone number where you may be reached in order to assure your participation by teleconference during the meeting.

The purpose of the meeting will be to discuss pending litigation involving the Company and such other matters as may be placed before the Board for proper consideration. Counsel for the Company may participate in the meeting.

It is the intent of the undersigned to agree to the attendance of counsel for any member of the Board for the purpose of providing advice and consultation to such Board member.

*Richard L. Gilbert*
Judge of the Superior Court (Ret.)
2630 "J" Street
Sacramento, California 95816
Tel: 916.442.0414/Fax: 916.442.7046
richardlgilbert@rgilbertadr.com
visit us on the web at richardlgilbertadr.com

-----------------------------------------------------------------------

1

7

 *Proud Sponsor* 

CONFIDENTIALITY NOTICE:

This email and any attachment is intended solely for the recipient(s) listed in the heading.  Unless otherwise noted, it contains information that may be privileged, confidential or otherwise protected by law from disclosure. If you have received this message in error, please notify the sender and delete the message.  Thank you.



**LAW OFFICE OF
TIMOTHY A. CHARSHAF
A PROFESSIONAL CORPORATION**

5176 HILLSDALE CIRCLE
SUITE 100
EL DORADO HILLS, CA 95762

P 916.933.2174
F 916.251.2902
TAC@HLGUSA.COM

VIA ELECTRONIC MAIL ONLY - rniro@nshn.com; joehmke@diepenbrock.com

October 20, 2015

Raymond P. Niro, Esq.
Niro Haller & Niro
181 West Madison Street, Suite 4600
Chicago Illinois 60602

John C. Oehmke, Esq.
Diepenbrock Elkin LLP
500 Capitol Mall, Suite 2200
Sacramento, California 95814

Re:    *Grail Semiconductor, Inc. v. Mitsubishi Electric, & Electronics USA, Inc.*, Santa
       Clara County Superior Court, Action Number 01-07-CV-098590

Gentlemen:

Judge Gilbert forwarded me Mr. Niro's electronic message to him today with an
accounting of creditor payments made through today. Included in that accounting was an
undated disbursement from Mr. Niro's account to Donald Stern in the amount of
$2,750,000.00.

There was a special meeting of the Board of Directors on October 14, 2015 during which
there was a resolution authorizing certain disbursements of the MEUS settlement
proceeds from Mr. Niro's trust account. Mr. Niro attended the beginning portion of that
meeting and Don attended the entire meeting. After Mr. Niro left the meeting, Judge
Gilbert made a motion to authorize Grail's payment of $2,750,000.00 to Don. Don
seconded the motion. Don was recused from voting on the motion as he was an
interested director. Robert Stern, also in attendance at the meeting (by telephone and
with his attorney Edward Klein), voted against the motion. There being a deadlock of a
quorum of Directors authorized to vote on the matter, the matter was tabled to allow for
Judge Gilbert to petition a court of competent jurisdiction for the appointment of a
provisional director under California Corporations Code Section 308 to break the
deadlock.

**Exhibit B**

Raymond P. Niro, Esq.
Niro Haller & Niro

John C. Oehmke, Esq.
Diepenbrock Elkin LLP

October 20, 2015
Page Two

Robert has continually informed Don and Grail that any prior Board resolution authorizing the payment was invalid and unenforceable.

My October 15, 2015 electronic mail to Mr. Niro (amended twice by follow up electronic mails that same day) sent on behalf of Grail, authorized Mr. Niro to disburse funds to certain, specified payees. Don was not included on that list.

As had been so eloquently summarized by Mr. Klein, and retold to me by Judge Gilbert, the current task assigned to Judge Gilbert – that being the negotiation of payments to Grail's creditors from a finite sum without undergoing years of further litigation – is one where Judge Gilbert must negotiate an extremely difficult, obstacle-laden maze. A creditor can either be yet another obstacle in that maze or he can help Judge Gilbert make it to the other side.

Whether or not Don is entitled to the money is not at issue here. Grail is the client – not Don. The MEUS settlement funds belong to Grail and can only be disbursed pursuant to Grail's direction.

The challenged transaction can be unwound. Don can return all of the money to Mr. Niro's client trust account immediately.

You are both authorized to directly contact Judge Gilbert first thing tomorrow to work out the details. This incident can and should be resolved immediately.

Very truly yours,

LAW OFFICE OF TIMOTHY A. CHARSHAF, A P.C.

By: _____
      Timothy A. Charshaf
TAC/adr
Cc: Judge Richard Gilbert (Ret.)



**LAW OFFICE OF**
**TIMOTHY A. CHARSHAF**
**A PROFESSIONAL CORPORATION**

5176 HILLSDALE CIRCLE
SUITE 100
EL DORADO HILLS, CA 95762

P 916.933.2174
F 916.251.2902
TAC@HLGUSA.COM

VIA ELECTRONIC MAIL ONLY - joehmke@diepenbrock.com

October 29, 2015

John C. Oehmke, Esq.
Diepenbrock Elkin LLP
500 Capitol Mall, Suite 2200
Sacramento, California 95814

Re:   *Grail Semiconductor, Inc. v. Mitsubishi Electric, & Electronics USA, Inc.*, Santa
      Clara County Superior Court, Action Number 01-07-CV-098590

Dear John:

I am writing to again demand the immediate return of the $2,750,000.00 wrongfully
disbursed from Mr. Niro's account to your client after the October 14, 2015 Board of
Directors meeting.

As you and your client are well aware, Grail did not authorize the payment to your client.
The Board voted to seek appointment of a provisional board member appointed so that
the matter may be presented to the Board and voted upon. The company has been unable
to initiate the application for the appointment of a provisional director because of Mr.
Hofer's litigation tactics. It will do so immediately upon the return of the funds from
your client.

As a majority shareholder and member of the board, Donald Stern owes fiduciary duties
toward the minority shareholders as well as to the corporation. (See, e.g., *Jones v. H. F.
Ahmanson & Co.* (1969) 1 Cal. 3d 93, 108; *Smith v. Tele-Communication, Inc.* (1982)
134 Cal.App.3[rd] 338, 343-344.) Further, your client's act in demanding or receiving the
property with knowledge of the Board's vote could be interpreted as an intentional
conversion of a substantial corporate asset for his own personal gain.

# Exhibit C

11

John C. Oehmke, Esq.
Diepenbrock Elkin LLP
October 29, 2015
Page Two

We have discussed, repeatedly, the substantial adverse consequences that your client's conversion of these funds is causing the company, and I see no need to repeat those here. Suffice to say that Grail retains all of its rights and remedies with respect to your client's conduct.

Very truly yours,

LAW OFFICE OF TIMOTHY A. CHARSHAF, A P.C.

By: _____
      Timothy A. Charshaf
TAC/adr
Cc:    Director Judge Richard Gilbert (Ret.) C/O Paul S. Aronowitz, Esq. (via electronic mail)
       Director Robert Stern C/O Edward A. Klein, Esq. (via electronic mail)

WESTLAW

225 Cal.App.4th 786
Court of Appeal,
Sixth District, California.

**Grail Semiconductor, Inc. v. Mitsubishi Electric & Electronics USA, Inc.**

Court of Appeal, Sixth District, California.    April 22, 2014    225 Cal.App.4th 786    170 Cal.Rptr.3d 581    14 Cal. Daily Op. Serv. 4248    2014 Daily Journal D.A.R. 5499

v.

MITSUBISHI ELECTRIC & ELECTRONICS USA, INC., Defendant and
Appellant.

H038714

Filed April 22, 2014
Hearing denied May 20, 2014
Review denied August 13, 2014

**Synopsis**
**Background:** Memory chip designer brought action against prospective investor for breach of contract, seeking damages, injunctive and declaratory relief, and a constructive trust. The Superior Court, Santa Clara County, No. 1–07–CV098590, Kenneth P. Barnum, J., entered judgment on special jury verdict for designer but ordered a new trial on damages. Designer and prospective investor appealed.

**Holdings:** The Court of Appeal, Elia, J., held that:

1 amount that a joint venture should have paid in royalties was not a proper measure of damages; but

2 documents describing memory chip's design were admissible as business records; but

3 trial court was not required to grant chip designer's request for permanent injunction.

Affirmed.

**West Headnotes (15)**

Change View

1    **Contracts** ⚖️ Weight and sufficiency in general
Jury's finding that memory chip designer suffered harm from prospective investor's breach of nondisclosure agreement in misappropriating designer's technology, in finding investor liable for breach of contract, was supported by substantial evidence, including the testimony of both parties' witnesses.

2    **Damages** ⚖️ Contracts conferring exclusive privileges or restricting competition
The amount that a joint venture 45 percent owned by a prospective investor in a memory chip technology should have paid in royalties for the joint venture's use of the technology, calculated by the joint venture's profits from its sales using the technology, was not a proper measure of damages for prospective investor's breach of nondisclosure agreement in disclosing the technology to the joint venture for development, since the amount that the joint venture should have paid in royalties did not establish a basis for estimating what the prospective investor would have paid for a license to use the technology.

1 Case that cites this headnote

3    **Evidence** ⚖️ Form and Sufficiency in General
Original Japanese versions of documents describing memory chip's design on European and American versions of prospective investor's joint venture's

SELECTED TOPICS

Measure of Damages
    Damages of Lost Profits

Injunction
    Nature and Grounds (approx. 14 pages)
    Trial Court Grant of Injunctive Relief

Appeal and Error
    Review
    Result Absent Evidentiary Error

Secondary Sources

APPENDIX B: FEDERAL REGULATIONS
Employer's Guide to the Health Insurance Portability and Accountability Act Appendix B
...Editor's Note: Many of HIPAA's portability rules, as finalized Dec. 30, 2004 (69 Fed. Reg. 78763), were superseded or rendered moot by the Patient Protection and Affordable Care Act, which required the...

APPENDIX B: FEDERAL REGULATIONS
Employer's Guide to HIPAA Privacy Requirements Appendix B
...Editor's Note: Following is the consolidated version of HIPAA's privacy regulations, originally finalized in 2000 and updated repeatedly since then. The text changed by the January 2013 final omnibus r...

s 965.   Review dependent on prejudice to rights of party
5 C.J.S. Appeal and Error § 965
...In the interest of the orderly administration of justice and for the avoidance of useless expense to litigants, it is a fundamental principle of appellate procedure that a party cannot assign as error ...

See More Secondary Sources

Briefs

BRIEF FOR THE UNITED STATES
1999 WL 6660
Ellis E. Neder, Jr. v. U.S.
Supreme Court of the United States
Jan. 04, 1999
...The opinion of the court of appeals (Pet. App. 1a-13a) is reported at 136 F.3d 1459. The judgment of the court of appeals was entered on March 19, 1998. The petition for a writ of certiorari was filed ...

BRIEF FOR PETITIONER
1994 WL 260792
O'Neal (Robert) v. McAninch (Fred), Warden
Supreme Court of the United States
June 02, 1994
...The decision of the United States Court of Appeals for the Sixth Circuit is reported. O'Neal v. Morris, 3 F.3d 143 (6th Cir. 1993) (Joint Appendix (hereinafter J.A.) 217-29). The entry of the Court o...

Petitioners' Reply Brief to Brief in Opposition to Petition for Writ of Certiorari
1996 WL 33467342
Ed K. MCDANIEL, Warden, Ely State Prison,

Exhibit D

13

website, a Uniform Resource Locator (URL) notation on one of the documents, and the testimony of a senior director of the joint venture were sufficient to support trial court's admission of the documents under the business record hearsay exception, in memory chip designer's action against prospective investor for breach of nondisclosure agreement. Cal. Evid. Code § 1271.

---

**4    Evidence** 👈 Form and Sufficiency in General
The foundational evidence used to establish the business record hearsay exception need not be presented by the custodian of the record or the employee who personally prepared it. Cal. Evid. Code § 1271.

1 Case that cites this headnote

---

**5    Appeal and Error** 👈 Prejudice to Rights of Party as Ground of Review
In civil cases, a miscarriage of justice requiring reversal should be declared only when the reviewing court, after an examination of the entire cause, including the evidence, is of the opinion that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error. Cal. Const. art. 6, § 13; Cal. Civ. Proc. Code § 475.

2 Cases that cite this headnote

---

**6    Appeal and Error** 👈 Prejudice to Rights of Party as Ground of Review
In determining whether a miscarriage of justice requiring reversal should be declared, Court of Appeal is not to look to the particular ruling complained of in isolation, but rather must consider the full record. Cal. Const. art. 6, § 13; Cal. Civ. Proc. Code § 475.

---

**7    Appeal and Error** 👈 Rulings as to evidence
The appellant bears the burden of establishing that the erroneous admission of evidence in a civil case was prejudicial. Cal. Const. art. 6, § 13; Cal. Civ. Proc. Code § 475; Cal. Evid. Code § 353.

1 Case that cites this headnote

---

**8    Appeal and Error** 👈 Documentary evidence; photographs
Any error in trial court's admission of documents from prospective investor's joint venture's website describing memory chip's design under the business record hearsay exception was not prejudicial as to jury's finding that prospective investor breached nondisclosure agreement covering "inductive storage capacitor" chip design, even though the documents stated that the joint venture's design included an "inductor," where the court allowed contrary defense evidence indicating that the word "inductor" in the exhibits was a mistranslation from the Japanese, and the challenged exhibits pertained only to one of the two chips alleged to have copied the design covered by the nondisclosure agreement. Cal. Evid. Code § 1271.

---

**9    Injunction** 👈 Equitable nature of remedy
**Injunction** 👈 Recovery of damages
A permanent injunction is an equitable remedy for certain torts or wrongful acts of a defendant where a damages remedy is inadequate. Cal. Civ. Proc. Code § 3422.

---

**10    Injunction** 👈 Nature of remedy in general
A permanent injunction is a determination on the merits that a plaintiff has prevailed on a cause of action for tort or other wrongful act against a defendant and that equitable relief is appropriate. Cal. Civ. Proc. Code § 3422.

---

**11    Injunction** 👈 Irreparable injury
To say that the harm is "irreparable," as would support permanent injunction, is simply another way of saying that pecuniary compensation would not afford adequate relief or that it would be extremely difficult to ascertain the amount that would afford adequate relief.

Frankie Sue Del Papa, Attorney General of the State of Nevada, Petitioners, v. Patrick Charles MCKENNA, Respondent.
Supreme Court of the United States
Mar. 04, 1996
...FN* Counsel of Record Note: Table of Contents page numbers missing in original document Most of McKenna's argument opposing review of the State's petition is devoted to grossly misleading claims that t...

See More Briefs

**Trial Court Documents**

USA, v. MAALI, et al.

2005 WL 6073954
USA, v. MAALI, et al.
United States District Court, M.D. Florida.
Sep. 08, 2005
...The defendant was found guilty on Counts 54, 56, 57, 58, 59-71 of the Third Superseding Indictment. Accordingly, the court has adjudicated that the defendant is guilty of the following offenses: C1Titl...

USA, v. MAALI, et al.

2005 WL 6073953
USA, v. MAALI, et al.
United States District Court, M.D. Florida.
Sep. 08, 2005
...The defendant was found guilty on Counts 1, 4-6, 8, 9, 12-14, 16-22, 24-32, 34-37, 39-43, 45-51, 53, 54, 56-71 of the Third Superseding Indictment. Accordingly, the court has adjudicated that the defen...

In re Kid Brands, Inc.

2014 WL 5419123
In Re: KID BRANDS, INC., et al., De..._...
United States Bankruptcy Court, D. New Jersey.
Sep. 08, 2014
...The relief set forth on the following pages, numbered 2 through 35, is hereby ORDERED. September 8, 2014 <<signature>> USBJ Upon the Motion of the Debtors for Entry of an Order (I) Authorizing the Sale...

See More Trial Court Documents

12    **Appeal and Error**    Injunction
     **Appeal and Error**    Refusing injunction
     **Injunction**    Discretionary Nature of Remedy
     The grant or denial of a permanent injunction rests within the trial court's sound discretion and will not be disturbed on appeal absent a showing of a clear abuse of discretion.

13    **Appeal and Error**    Burden of showing grounds for review
     The burden is on the party challenging a permanent injunction on appeal to demonstrate an abuse of the trial court's discretion. Cal. Civ. Code § 3422.

14    **Injunction**    Disclosure or use of trade secrets or confidential information
     Trial court was not required to grant memory chip designer's request for permanent injunction against prospective investor's continued disclosure of information about memory chip design in violation of nondisclosure agreement, even though the agreement allowed for injunctive relief, absent evidence that damages would be insufficient to prevent any future harm from prospective investor's breach in disclosing the design to a joint venture that it partly owned or that prospective investor was continuing to disclose information in violation of the agreement.

15    **Injunction**    Equitable nature of remedy
     **Injunction**    Adequacy of remedy at law
     **Stipulations**    Matters Concluded
     An injunction is an equitable remedy, which may be denied notwithstanding the parties' contractual stipulation if the remedy at law is adequate.

     *See* 9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, § 871.

---

**\*\*583** Santa Clara County Superior Court, Hon. Kenneth P. Barnum. (Santa Clara County Super. Ct. No. 1–07–CV098590)

**Attorneys and Law Firms**

Davis Wright Tremaine and Martin L. Fineman, San Francisco, Russell J. Hanlon, San Jose, for Plaintiff and Appellant

Sidley Austin, Los Angeles, Peter I. Ostroff, Mark E. Haddad and Michelle B. Goodman, for Defendant and Appellant.

**Opinion**

ELIA, J.

**\*788** After a jury reached a verdict in favor of plaintiff Grail Semiconductor, Inc. (Grail), on Grail's action for breach of contract, the trial court ordered a new trial on damages, at the request of defendant Mitsubishi Electric & Electronics USA, Inc. (Mitsubishi). Both parties appeal. Mitsubishi contends that (1) the court should have ordered judgment notwithstanding the verdict (JNOV) instead of a new trial because Grail failed to establish the element of damages, and (2) the court should at least have granted a new trial on liability for breach of contract because it had prejudiced Mitsubishi's **\*789** defense by admitting untrustworthy hearsay documents as business records. In its appeal Grail contends that the court erred by refusing to grant it injunctive relief. We find no prejudicial error and therefore must affirm the orders.

*Background*

The issues in this action revolved around the disclosure of a new technology in memory chip design created by inventor Donald Stern, cofounder of Grail. Before Stern's invention there were three kinds of memory: SRAM (static random access memory), which is fast but large and expensive; DRAM (dynamic random access memory), which is small and cheap but requires more power and, like SRAM, is volatile (i.e. it loses data when electric power is removed); and FLASH (or "flash") memory, which is nonvolatile (i.e., retains the

Case: 16-02088      Filed:05/12/16    Doc:18

information even if the electrical power is removed), but relatively slow. Stern's idea was to combine the strengths of those three memory types—"the density of DRAM, [the] speed of SRAM and the non-volatility of FLASH"—in a single chip. Witnesses expressed the view that if the design worked, it would be revolutionary, using words like "disruptive" (a "unique" innovation with "great utility" which "totally changes the market") and the "Holy Grail" of memory technology.

Stern's invention used the property of inductance, which occurs "when current passes through a wire, [causing] a magnetic field to form. And then when the current stops, the magnetic field collapses." "Inductance" had always been considered a "bad thing," an effect to be eliminated; it created extra signals and caused electrical noise and errors to occur in the circuits. Stern's departure from this "conventional wisdom" involved "figuring out how to take the inductive force and actually using it to accelerate the storing of the charge into the layers to allow the device to operate much, much faster." Stern obtained a patent for his design, which he called an "inductive storage capacitor."[1]

**\*584** In January 2000 Stern and his cousin Robert Stern incorporated a startup company in order to market Stern's technology. Between the last quarter of 2000 and the first quarter of 2003 Grail unsuccessfully tried to recruit investors in the company. By March of 2001 Grail had run out of money.

**\*790** In the morning of April 19, 2001, Stern and Grail met with two representatives of Mitsubishi, Ryuichi Matsuo and Kazutoshi Hirayama,[2] along with representatives of two other companies—Global Alliance, a "finder" for Mitsubishi, and Asia Star Ventures, a consulting company that introduced Silicon Valley startups to Asian companies. Also in attendance were Terry Speizer, the Grail president and chief operating officer, and Mark Speizer, its chairman and chief executive officer. At the meeting, Matsuo signed a nondisclosure agreement (NDA) which required Mitsubishi "to keep in strict confidence and trust and not use, disclose or make available to others, including any of its affiliates or third parties any 'Proprietary Information' and 'Company Documents and Materials' (together 'INFORMATION') without the prior written consent of [Grail]."

Grail then gave a PowerPoint presentation describing the technology, including the concept of the use of inductive force. Witnesses gave conflicting testimony about whether any of the information presented at the meeting was confidential. Both Terry and Mark Speizer maintained that Stern had always refused to disclose the details of his technology to anyone, including them; indeed, he appeared to be extremely concerned that someone would try to steal his ideas, and he would not agree to have it tested for investors.

Stern testified that in the afternoon the group met again in Grail's San Jose office. But both Speizers asserted that there was no afternoon meeting in Grail's office; by that time the office had already been closed to save money. According to Stern, they split up into two groups, and he met privately with Hirayama while the Speizers met with Matsuo about the business plan. During this second meeting, Stern said, he disclosed to Hirayama 16 items of confidential information. Stern showed Hirayama drawings that had been submitted with the patent application and explained the "concept of [using] inductance to store electronic charges." Hirayama took extensive notes in Japanese and made copies of Grail's drawings, including some of the patent application drawings.

Grail's efforts did not culminate in any outside investment or product development. In June 2004, however, Stern read an article regarding technology promoted by Renesas Technology, which had been formed in April 2003 through a joint venture between Mitsubishi Electric Company (Mitsubishi Japan), the parent company of defendant Mitsubishi USA, and Hitachi, Ltd. (Hitachi).[3] At the time it was formed, 55 percent of Renesas was owned by **\*791** Hitachi and 45 percent was owned by Mitsubishi Japan. Hirayama was one of the 143 Mitsubishi employees from the 320-employee Electronic Device Group who transferred to Renesas in 2003. He remained there for seven months.

**\*\*585** The 2004 article Stern saw discussed a new Renesas memory chip which Stern believed incorporated Grail's technology in violation of the NDA. In June 2007 Grail initiated this action, alleging misappropriation of trade secrets, unfair competition, breach of contract, and related causes of action. Its fifth amended complaint, the operative pleading at trial, filed in late 2009, stated only one cause of action, for breach of contract; it sought not only damages but injunctive and declaratory relief and a constructive trust.

During the 2012 trial extensive testimony was presented on two products publicized in 2004 by Renesas: a new memory cell called SuperSRAM and its use of MONOS (metal, oxide, nitride, oxide, silicon)[4] embedded flash memory in its microcontroller unit (MCU)

Case 16-02088    Filed 05/12/16    Doc 18

devices.

Yuji Kihara, the designer of SuperSRAM, testified that he did not communicate with Hirayama or Matsuo about the design of SuperSRAM during his time at either Mitsubishi or Renesas. Kihara also stated that SuperSRAM did not combine the features of flash, DRAM, and SRAM. It improved the performance and solved the problems of conventional SRAM at reduced cost, but could not achieve "as high a density as flash or DRAM." Kihara did state that SuperSRAM had the same capacity as DRAM (larger than SRAM), and that "circuit wise it mainly uses DRAM." But he also explained the reduced soft error rate, [5] which was achieved through two capacitors rather than one, as in "the usual DRAM." Kihara obtained two patents for the SuperSRAM technology.

A critical part of Kihara's testimony regarding the SuperSRAM design was whether inductance was involved. Kihara stated that he did not contemplate its having an inductive effect, nor did testing reveal any. His product, he insisted, had "nothing to do with inductance."

The other semiconductor invention at issue was the new MONOS technology, codeveloped by Shinichi Minami, another Hitachi employee who had transferred to Renesas in 2003, and his colleague, Professor Kamigaki. Minami brought with him the work he had focused on at Hitachi in *792 developing the MONOS flash memory cell. He testified that the development of this technology was *not* performed in isolation from anyone else in the organization. He further stated, however, that the design of the product was finalized by October 2000, before Hirayama's meeting with Stern, although it was not ready for mass production until January 2004.

One of plaintiff's expert witnesses, Joseph McAlexander, examined the structures of both Renesas products and compared them to the Grail devices, with the assistance of Chipworks, a respected company that used advanced optical techniques to analyze the components of electrical devices. In McAlexander's opinion, Mitsubishi had breached the NDA by disclosing Grail's confidential information to Renesas, which then used it for its products. SuperSRAM, he explained, appeared to be a composite device combining the features of DRAM and SRAM. Ten of the 16 items of confidential Grail information disclosed by Stern had appeared in the SuperSRAM chips, a "highly improbable" **586 result. As to the MONOS MCU, while the design had, according to Minami, been finalized in late 2000, McAlexander explained that Renesas had "evolved it" so as to make it faster, with a "much smaller footprint." The MONOS memory structure, he stated, included an inductive capacitor, which allowed less energy to be used. Overall, in the MONOS product Renesas had "really developed a considerable competitive edge in terms of speed and power and retention as compared to competitors." And those critical changes were made to existing technology after the transition to Renesas in 2003. Of the 16 items of confidential information disclosed to Mitsubishi, 11 had been implemented in the MONOS embedded flash MCUs. Again, McAlexander said, it would be "highly improbable" that these 11 items would be found in a specific design without some prior knowledge.

Grail offered three measures of damages through the testimony of Joseph Gemini. Gemini first suggested that damages should be based on Grail's expectations consistent with its business plan—that is, the projected net cash flow, discounted by 15 percent, if Mitsubishi had bought the technology. That amounted to $123,898,889. A second approach, Gemini explained, was to calculate the royalty Mitsubishi would have paid for use of the technology, based on the *Renesas* sales resulting from that use. Discounted by 7.5 percent, that royalty (estimated as a lump sum) amounted to $203 million. A third measure was unjust enrichment, or "the benefit that Mitsubishi would have realized for taking ... and using the technology unauthorized." That amount was a portion of the operating profit that Renesas had realized from using the Grail technology, which was $252 million.

The jury found that Mitsubishi had breached the NDA Matsuo had signed at the outset of the April 19, 2001 meeting, and that Grail was harmed by the breach. In its verdict the jury determined damages to amount to $123,898,889. Judgment on the verdict was entered on May 16, 2012.

*793 Mitsubishi moved for JNOV, attacking both the finding of breach and the measure of damages used by the jury. Mitsubishi also moved for a new trial, again asserting insufficient evidence of breach and excessive damages. It also challenged the admission of two Renesas Web site pages as exhibits, the exclusion of testimony about other products by its expert witness, and the court's refusal to give Mitsubishi's proposed

17

special instruction on judicial admissions.

The trial court orally denied the motion for JNOV, finding substantial evidence to support the verdict on the issue of breach. It also denied Mitsubishi's new trial motion on each ground except one: the jury had used an incorrect measure of damages, resulting in an excessive award. Mitsubishi then filed its notice of appeal.[6]

In its May 16, 2012 judgment on the jury verdict the court awarded prejudgment interest and injunctive relief. Mitsubishi moved to vacate the judgment, as it had been entered without support in either the law or the facts and because Mitsubishi had not had an opportunity to be heard on such relief. At a hearing on July 24, 2012, the court suggested that the grant of a new trial made unnecessary an order for interest **587 or an injunction.[7] On July 27, 2012, the court issued a written order vacating the May 16 judgment. In the order it formally denied the JNOV motion but found the issues of prejudgment interest and injunctive relief to be moot.

Grail challenged the court's finding as to the injunction, citing a provision for injunctive relief in the NDA and asserting the necessity of the remedy for Grail's future commercial opportunities. At a hearing on Grail's renewed motion for an injunction on September 7, 2012, the court agreed with Mitsubishi that Grail had not shown the likelihood of irreparable harm that could not be compensated by damages, particularly since Grail had agreed to an injunction followed by an immediate stay. The court filed its written order denying the request on September 18, 2012. Grail then filed a notice of cross-appeal.[8]

*794 Discussion

*1. Mitsubishi's Appeal*

*a. Denial of JNOV on Damages*
Mitsubishi first contends that the trial court granted the wrong remedy by ordering a new trial instead of JNOV. In its view, Grail simply failed to present sufficient evidence of damages, which required a defense judgment as a matter of law.

As both parties recognize, the purpose of a JNOV is "to prevent the moving defendant from the necessity of undergoing any further exposure to legal liability when there is insufficient evidence for an adverse verdict." (*Fountain Valley Chateau Blanc Homeowner's Assn. v. Department of Veterans Affairs* (1998) 67 Cal.App.4th 743, 750, 79 Cal.Rptr.2d 248.) "A motion for judgment notwithstanding the verdict may be granted only if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is no substantial evidence in support. [Citation.]" (*Sweatman v. Department of Veterans Affairs* (2001) 25 Cal.4th 62, 68, 104 Cal.Rptr.2d 602, 18 P.3d 29.)

If the trial court had granted a new trial based on inadequacy of Grail's proof of the damages element of its claim, Mitsubishi would have a more tenable argument. (See *Carter v. CB Richard Ellis, Inc.* (2004) 122 Cal.App.4th 1313, 1327, 19 Cal.Rptr.3d 519 [where weight of evidence did not support jury finding that contract existed, proper remedy was JNOV, not new trial]; *Garretson v. Harold I. Miller* (2002) 99 Cal.App.4th 563, 575, 121 Cal.Rptr.2d 317 [JNOV properly granted where defect was in plaintiff's failure of proof rather than erroneous ruling by trial court].) But the court here made it clear that the excessive damages award resulted from the jury's application of the wrong *measure* of damages, not from insufficient evidence that Grail suffered damage.[9] The jury had **588 obviously based its award on the *795 total* value of the technology Mitsubishi had disclosed to Renesas in violation of the NDA, measured by estimates of cash flows predicted by the business plan.

Relying on *Ajaxo Inc. v. E\*Trade Group, Inc.* (2005) 135 Cal.App.4th 21, 55–57, 37 Cal.Rptr.3d 221, the court explained that the correct measure of damages for breach of an NDA was the value of the benefit conferred on the defendant, which in this case was the value of the technology taken by Mitsubishi—but not the *total* value, because Grail still had the ability to profit from its own technology. Instead, the jury should have determined damages according to the amount Mitsubishi would have paid on April 19, 2001, for a lump-sum, fully paid license to use the confidential information. The court also cited *Celeritas Technologies, Ltd. v. Rockwell Intern. Corp.* (Fed. Cir. 1998) 150 F.3d 1354, 1359–1360, where the appellate court held that the jury had properly determined damages based on the license fee the defendant would have paid had it not breached the parties' nondisclosure agreement, by calculating a reasonable royalty based on the defendant's sales forecasts. The court found further support for this position in the

18

second Ajaxo case, *Ajaxo Inc. v. E*Trade Group, Inc.* (2010) 187 Cal.App.4th 1295, 115 Cal.Rptr.3d 168. There, as in this case, "Ajaxo retained possession of the secrets and could still license its technology to others. Under the common law, 'Where the plaintiff retains the use of the secret, as here, and where there has been no effective disclosure of the secret through publication the total value of the secret to the plaintiff is an inappropriate measure [of damages for misappropriation].' [Citation.]" (*Id.* at p. 1306, 115 Cal.Rptr.3d 168.)

1    It is beyond question here that Grail established every element of breach of contract, including resulting harm. The court did not find insufficient proof of the existence of damages; it ruled only that the amount of those damages was calculated incorrectly and therefore warranted a new trial using the correct measure of value.

Mitsubishi argues that Grail has "waived any challenge" to the measure of value used by the jury by not cross-appealing on that ground. But Grail is not making any such challenge. Grail's point is only that substantial evidence of damages was presented through both parties' witnesses. As the issue will be retried, whether the original jury received sufficient evidence of damages under any particular measure is moot.

2    Mitsubishi attempted in its JNOV motion to refute the viability of Grail's second measure of damages, the amount of a royalty Mitsubishi would have paid for use of the technology. On appeal, Mitsubishi again raises that issue, contending only that the trial court "properly recognized that the evidence offered to support Mr. Gemini's opinion of 'what Mitsubishi would have paid **796** for use of the technology' ... was 'based entirely on speculation and unfounded assumptions.' " But this argument again goes only to the state of the evidence presented rather than the legal viability of the measure at issue. It also mischaracterizes the court's ruling. The court did not state that the amount the breaching party would have paid to license the technology was an inappropriate measure of Grail's damages; on the contrary, it **589** affirmed that measure as a guide to a damages calculation. The court only declined to use *Celeritas* as a guide, because there a reasonable royalty could be estimated "based on the defendant's sales projections, the parties' own previous licensing practices, and the licensing practices of others in the modem industry." Whereas in *Celeritas* the *defendant's* actual sales projections provided a basis for estimating the amount the defendant would have paid for a license, here no comparable basis existed for estimating what Mitsubishi would have paid for a license; what *Renesas* should have paid in royalties, calculated by Renesas's profits from its sales using Grail's technology, was irrelevant. Thus, it was an error in the measure of damages that created the excess in the damages award, not simply a failure to prove any harm. The grant of a new trial was accordingly made not to shore up the evidence but to establish a *legally* sufficient measure reflecting the "value of what [Mitsubishi] actually took from Grail," a measure the court defined as "the amount [Mitsubishi] likely would have paid for a license to use or transfer the technology." Neither party has presented any reason on appeal to reject this theory of recovery. [10]

The third measure of damages, unjust enrichment, was also determined to be incorrectly used by Gemini in his calculations. Again it was the measure, not the sufficiency of evidence, that the court rejected. The $252 million figure Gemini cited was based on profits from the sale of Renesas products containing Grail's technology, which, in the court's view, was not "a reasonable basis for estimating what [Mitsubishi] would have paid for a license to use technology disclosed subject to the NDA." No issue is presented contesting this ruling.

*b. Admission of Documentary Evidence*
Mitsubishi next argues that the erroneous admission of two exhibits offered by Grail was prejudicial and necessitated a new trial on liability. At trial Grail called William Keeley, a senior director at Renesas, to testify as the Renesas company representative. Keeley was unfamiliar with the MONOS chip; he was therefore unable to confirm that Renesas's MONOS chip was an "inductive capacitor" or that it trapped electrons through "inductives"; indeed, he could not even "say for certain that the devices [he] sold used a **797** MONOS structure." Grail attempted to elicit testimony that Renesas *represented* that its MONOS chip had an inductor; Keeley could not provide that affirmation. Grail then showed Keeley an exhibit referred to as PTX-20, which appeared to be a document from Renesas's European Web site. The court admitted the exhibit over Mitsubishi's objection on grounds of hearsay, lack of personal knowledge, and lack of authentication. Keeley nevertheless maintained that he was simply not familiar enough with the technology to state that the "inductor" representation in the document was accurate or inaccurate.

Grail then showed Keeley PTX-19, a similar document derived from Renesas's American Web site. Like PTX-20, this exhibit represented that the MONOS chip had an inductor. Mitsubishi did not object to the admission of PTX-19, though Renesas, which was monitoring the trial, did object, because the witness could not state "how the marketing department created [the document], whether the person who created it had a duty to create it in a certain way or to meet the business record exception." The court overruled the objection. **590 Joseph McAlexander subsequently testified that PTX-19 showed that an inductor was part of Renesas's MONOS technology.

Mitsubishi responded with evidence suggesting that the word "inductor" in the Web sites was a mistranslation from the Japanese version, which should be translated as "dielectric," an insulating material that does not conduct electricity. Keeley explained that Renesas news releases were normally written in Japan and later translated before being sent to the United States and Europe, with various degrees of preliminary editing and occasional inaccuracies. In this case, he believed that a translation error had led to the use of the word "inductor" in PTX-20. An alternative translation contained in DTX-267 made more sense to Keeley; it used the word "dielectric" rather than "inductor." Shinichi Minami disagreed with even the representation that Renesas's MONOS chip trapped electrons by using an inductor; the word "inductor" in PTX-19, he insisted, was a mistranslation from the Japanese. Harry Tredennick, a defense expert, had obtained a certified translation and agreed with Minami and Keeley about the translation error. Tredennick suggested that the confusion resulted from the similarity of the Japanese characters used in "dielectric" and "inductor"; two of the characters were the same in the two words, while the third was different. Tredennick was convinced that there was no inductive storage capacitor in the MONOS MCU, though he agreed that any memory cell that did would be new and useful.

In its motion for a new trial Mitsubishi argued that PTX-19 and PTX-20 were erroneously admitted as business records. Keeley, it maintained, was not qualified to establish the trustworthiness of the documents, because (1) he *798 was not the custodian of the Web sites or the documents themselves, and (2) he lacked knowledge of their creation, maintenance, or accuracy. The trial court, however, agreed with Grail that the documents qualified under the business records exception to the hearsay rule stated in Evidence Code section 1271. It also noted that Mitsubishi had not objected to PTX-19, and it found no prejudice in any event.

On appeal Mitsubishi renews its argument that the court should not have admitted these two "smoking gun" exhibits, because they were the "cornerstone of Grail's case" and contained highly prejudicial hearsay for which no exception existed.

Evidence Code section 1271, the hearsay exception cited by the trial court in its ruling, provides: "Evidence of a writing made as a record of an act, condition, or event is not made inadmissible by the hearsay rule when offered to prove the act, condition, or event if: [¶] (a) The writing was made in the regular course of a business; [¶] (b) The writing was made at or near the time of the act, condition, or event; [¶] (c) The custodian or other qualified witness testifies to its identity and the mode of its preparation; and [¶] (d) The sources of information and method and time of preparation were such as to indicate its trustworthiness."

The superior court found the documents admissible under this provision because the qualifying witness, William Keeley, had testified that PTX-20 had the "look and feel" of a Renesas marketing document and that PTX-19 "generally look[ed] the same" to him as PTX-20. Moreover, the URL on the documents indicated that they "did indeed come from Renesas's North American and European websites." [11]

3     4     **591 Keeley's testimony was very general and thus could have been the ground for sustaining Mitsubishi's hearsay objection. But we agree with the superior court that the evidence of authenticity and trustworthiness supplied by Keeley's testimony was adequately supplemented by the URL notation on PTX-20, and by the original Japanese versions offered by Mitsubishi. And the court was correct that the foundational evidence need not be presented by the custodian of the record or the employee who personally prepared it. (*Jazayeri v. Mao* (2009) 174 Cal.App.4th 301, 324, 94 Cal.Rptr.3d 198.) We see no abuse of the court's broad discretion in admitting the exhibits as business records under Evidence Code section 1271. (Cf. *People v. Zavala* (2013) 216 Cal.App.4th 242, 245, 156 Cal.Rptr.3d 841 [court has wide discretion in determining whether proper foundation was laid for admission under business records exception.].)

5     6     7     *799 We further agree with the lower court that Mitsubishi has not

shown prejudice. A judgment of the trial court may not be reversed on the basis of the erroneous admission of evidence, unless that error was prejudicial. (Code Civ. Proc., § 475.) The record must show that the appellant "sustained and suffered substantial injury, and that a different result would have been probable if such error ... had not occurred or existed. There shall be no presumption that error is prejudicial, or that injury was done if error is shown." (*Ibid.*) Additionally, article VI, section 13, of the California Constitution provides that a judgment may not be set aside based on the erroneous admission of evidence "unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." Evidence Code section 353 reinforces that provision: we may not reverse a judgment "by reason of the erroneous admission of evidence unless ... [ ¶ ] ... [ ¶ ] ...the error or errors complained of resulted in a miscarriage of justice." (Evid. Code, § 353, subd. (b).) "In civil cases, a miscarriage of justice should be declared only when the reviewing court, after an examination of the entire cause, including the evidence, is of the opinion that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*Huffman v. Interstate Brands Companies* (2004) 121 Cal.App.4th 679, 692, 17 Cal.Rptr.3d 397.) In making this assessment "we are not to look to the particular ruling complained of in isolation, but rather must consider the full record in deciding whether a judgment should be set aside." (*Waller v. TJD, Inc.* (1993) 12 Cal.App.4th 830, 833, 16 Cal.Rptr.2d 38.) The appellant bears the burden of establishing that the error was prejudicial. (*Ibid.*)

8    In this case the jury heard abundant evidence, independent of PTX-19 and PTX-20, that Renesas's MONOS chip used an inductor, particularly through the testimony of Joseph McAlexander. In addition, the challenged exhibits pertained exclusively to the MONOS chip, while McAlexander's analysis of the SuperSRAM technology also suggested use of Grail's confidential information. After admitting the exhibits the court allowed contrary defense evidence indicating that the word "inductor" in the exhibits was a mistranslation from the Japanese word for "dielectric." The jury thus heard both sides of the issue, received documents purporting to be the same but in different languages, and reached a conclusion favorable to Grail. Having examined the asserted error in light of the entire record, we cannot find prejudice from the admission of the challenged documents. Consequently, **592** the trial court did not err in declining to grant a new trial on liability.

*2. Grail's Appeal*
As noted earlier, the trial court's initial judgment awarded Grail injunctive relief as requested in the second cause of action of the fifth amended *800* complaint. In its written order on the motions for JNOV and a new trial, the court found Grail's motion for pretrial interest and an injunction to be moot. Grail submitted a renewed motion for an injunction (which, like the original motion, is not in the appellate record), but the trial court denied it by written order on September 18, 2012. The court was unable to discern any threat of "irreparable harm," especially in view of Grail's agreement to a stay of any injunction that would be issued.

On appeal, Grail contends that it was entitled to an injunction upon the denial of Mitsubishi's motion for JNOV because (1) the NDA provided for this remedy, [12] and (2) it suffered "irreparable and continuing" harm through Renesas's successful use of Grail's technology.

9    10    "A permanent injunction is an equitable remedy for certain torts or wrongful acts of a defendant where a damage remedy is inadequate. A permanent injunction is a determination on the merits that a plaintiff has prevailed on a cause of action for tort or other wrongful act against a defendant and that equitable relief is appropriate." (*Art Movers, Inc. v. Ni West, Inc.* (1992) 3 Cal.App.4th 640, 646, 4 Cal.Rptr.2d 689.)

Civil Code section 3422 allows the court to grant a permanent injunction "to prevent the breach of an obligation existing in favor of the applicant: [¶] 1. Where pecuniary compensation would not afford adequate relief; [¶] 2. Where it would be extremely difficult to ascertain the amount of compensation [that] would afford adequate relief; [¶] 3. Where the restraint is necessary to prevent a multiplicity of judicial proceedings; or, [¶] 4. Where the obligation arises from a trust."

11    "The first two grounds 'embody the requirement that to obtain an injunction a plaintiff ordinarily must show that the defendant's wrongful acts threaten to cause irreparable injury, meaning injury that cannot adequately be compensated in damages.' " (*DVD Copy Control Ass'n, Inc. v. Kaleidescape, Inc.* (2009) 176 Cal.App.4th 697, 722, 97

Cal.Rptr.3d 856 (*Kaleidescape* ), *801 quoting *Syngenta Crop Protection, Inc. v. Helliker* (2006) 138 Cal.App.4th 1135, 1167, 42 Cal.Rptr.3d 191; see *Intel Corp. v. Hamidi* (2003) 30 Cal.4th 1342, 1352, 1 Cal.Rptr.3d 32, 71 P.3d 296 [plaintiff seeking injunction "must ordinarily show that the defendant's wrongful acts threaten to cause *irreparable* injuries, ones that cannot be adequately compensated in damages"].) "Irreparable harm may be established where there **593 is the fact of an injury, such as that arising from a breach of contract, but where there is an inability to ascertain the amount of damage. In other words, to say that the harm is irreparable is simply another way of saying that pecuniary compensation would not afford adequate relief or that it would be extremely difficult to ascertain the amount that would afford adequate relief." (*Kaleidescape, supra,* 176 Cal.App.4th at p. 722, 97 Cal.Rptr.3d 856.)

12    13   Grail acknowledges the standard of review. "The grant or denial of a permanent injunction rests within the trial court's sound discretion and will not be disturbed on appeal absent a showing of a clear abuse of discretion." (*Horsford v. Board of Trustees of California State University* (2005) 132 Cal.App.4th 359, 390, 33 Cal.Rptr.3d 644; see *Shapiro v. San Diego City Council* (2002) 96 Cal.App.4th 904, 912, 117 Cal.Rptr.2d 631.) The burden is on the party challenging the ruling to demonstrate such abuse. (*Jameson v. Five Feet Restaurant, Inc.* (2003) 107 Cal.App.4th 138, 146, 131 Cal.Rptr.2d 771.)

14   Here Grail failed to carry its burden to show that damages for Mitsubishi's breach would be insufficient to prevent any future harm. It did not demonstrate that Mitsubishi was continuing to disclose information in violation of the NDA; its focus was on *Renesas's* use of the technology for Renesas products. That conduct was itself the subject of a separate patent infringement action pending in federal court.

15   On this ground alone we must uphold the trial court's order. That the parties' contract allowed for injunctive relief is not controlling; an injunction is an equitable remedy, which may be denied notwithstanding the parties' contractual stipulation if the remedy at law is adequate. (See *Kaleidescape, supra,* 176 Cal.App.4th at p. 726, & fn. 6, 97 Cal.Rptr.3d 856 [citing decisions in accord from other jurisdictions].) As the facts in this record do not compel a conclusion as a matter of law that damages will be an inadequate remedy for Mitsubishi's breach of the NDA, we cannot find an abuse of discretion in declining to order injunctive relief.

*802 Disposition

The orders are affirmed. The parties shall bear their own costs.

WE CONCUR:

RUSHING, P.J.

PREMO, J.

**All Citations**

225 Cal.App.4th 786, 170 Cal.Rptr.3d 581, 14 Cal. Daily Op. Serv. 4248, 2014 Daily Journal D.A.R. 4920

Footnotes

1        A capacitor, Stern explained, is an electronic device used to store charge. An "inductive capacitor" involves "taking a capacitor and adding the inductive force to the capacitor to actually make it store and retain the charge and actually run faster."

2        Matsuo and Hirayama were "expatriates" of Mitsubishi's Japanese parent company, Mitsubishi Electric Company, often referred to as MELCO or Mitsubishi Japan. They were considered "employees of both Mitsubishi US and Mitsubishi Japan."

3        Renesas Technology became known as Renesas Electronics in 2010, after merging with NEC Electronics.

4        Defense witness Shinichi Minami, a former Renesas employee, described the acronym as including "semiconductor" rather than "silicon." Plaintiff's expert Joseph McAlexander explained it as "metal, oxide, nitride, oxide,

5   Kihara explained "soft error" as a phenomenon that occurs when memory data are "destroyed due to radiation. And as SRAM grew smaller in size, the memory area also grew smaller so that this phenomenon increased in occurrence."

6   An order denying a motion for JNOV is appealable under Code of Civil Procedure section 904.1, subdivision (a)(4).

7   Grail evidently had submitted a motion for prejudgment interest and an injunction, which was opposed by Mitsubishi. The motion itself is not in the appellate record.

8   Grail filed its notice of appeal on September 10, 2012, after the court's oral ruling on September 7 but before it filed its written order. We will construe its notice to have been filed after the September 18 written order. (Cal. Rules of Court, rule 8.104(d)(2).)

9   Grail's expert, Joseph Gemini, offered three alternative measures of damages. First, he said, "the damages should be based on what Grail's expectations were based on their business plan" and independent third party evaluations of the technology—i.e., $123,898,889. Second, Gemini proposed a measure based on a royalty applied to the sales that used the Grail technology—i.e., $203 million. Third, he calculated unjust enrichment by determining the portion of Renesas's operating profit attributable to the use of the Grail technology from 2003 through 2012—i.e., $252 million. The jury's verdict was identical to the first estimate.

Mitsubishi's expert, Brian Nappert, also testified that the harm to Grail was "the value ... of the state of the technology at the time of the April 2001 meeting." His estimate of damages was $2.1 million to $3.1 million. Under an unjust enrichment theory, he calculated the same amount.

10  We decline Grail's implicit suggestion that this court determine that *Celeritas* governs the proper measure of damages, as it is collateral to the issue raised by Mitsubishi in its appeal.

11  This appears to be true of PTX-20, but the copy of PTX-19 in the appellant's appendix does not contain a URL.

12  Paragraph 9 of the NDA stated: "Investor fully understands that a breach of any of the promises, duties, obligations and/or agreements contained in this Proprietary Information, Invention and Non-Disclosure Agreement will result in irreparable and continuing damage to the Company [ (i.e., Grail) ] for which there will be no adequate remedy at law. Accordingly, Investor further agrees that in addition to any and all remedies available at law and/or equity (including money damages), the Company shall be entitled to injunctive relief and/or decree for specific performance without the necessity of proving actual damages and that the Company shall be entitled to seek such equitable relief in any forum, including a court of law. The Company may pursue any of the remedies described herein concurrently or consecutively in any order as to any such breach or violation, and the pursuit of one of the remedies at any time will not be deemed an election of remedies or waiver of the right to pursue any of the other remedies."

---

**End of Document**          © 2016 Thomson Reuters. No claim to original U.S. Government Works.

From: Commercial Banking [mailto:commercialbanking@hsbc.com.hk]
Sent: Wednesday, March 30, 2016 4:21 AM
To: bradawc@cs.com
Subject: HK1160329-000358 GSC PIV RFI (KMM12034590V33164U0KM)

Ref:
HK114105Q4Q8LWQO 14OCT2015 USD 2,749,981.60 FROM NIRO HALLER NIRO LTD HK120105PMQQCKZK 20OCT2015
USD 99,000.00 TO MOM OS LLC HK114016PZ13UOXS 14JAN2016 USD 310,000.00 TO MOM OS LLC
HK126105PURCV8N4 26OCT2015 USD 100,000.00 TO DONALD STERN HK126026PT582VWG 26FEB2016 USD 100,000.00
TO DONALD STEVEN STERN
HK126026PY587UO0 26FEB2016 USD 250,000.00 TO FRANK BAUDER

Dear Sir

We refer to your USD Outward / Inward Telegraphic Transfer (ORTT//IRTT) during the period from 14Oct2015 to
26Feb2016.

It is a standard internal procedure to review USD Telegraphic Transfers and please provide further information of your
above payment transactions as follows.

1.   What is the purpose of the transactions? Hide the money as this money was transferred by Don Stern as a result of fraud.

2.   What goods or services were being exchanged for each transfer
above? No services - money was fraudulently transferred to Don Stern.

3.   Please describe how the funds from NIRO HALLER NIRO LTD for
$2,749,990 were utilized once they were credited to Billion Hope International Limited's account?
                                                                      Don Stern has been trying to hide the money by
                                                                      transfer. Lawyers are working on the return of this
                                                                      money

4.   Please provide the following information for your company BILLION
HOPE INTERNATIONAL LIMITED:
a.     Has the line of business ever changed or added recently?   No
b.     Please list all lines of business and specify in details what types
of goods/services your company is engaged in.   No business ever- Don Stern is trying to hide stolen money.
c.     Full name(s) of beneficial owner(s)/controlling officer(s)?  Donald Stern and Brad Woods
d.     Please list all jurisdictions/countries where your company operates
                                                                      This is not an operating company and Donald Stern had
business in.    California and United States                          no authority to transfer stolen money into this account.

5.   Please provide the following information for each counter party:
NIRO HALLER NIRO LTD

1

# Exhibit E

MOM OS LLC

a.      Please specify all lines of business of this entity (including what types of goods/services they are engaged in)?

b.      Complete address?

c.      What is the relationship between your company and this entity?   There is no relationship between these companies.

6.   Please provide the following information for each counter party:

DONALD STEVEN STERN

FRANK BAUDER

a.      Complete legal and physical address?   Don Stern - Unknown address

b.      Job title/position and source of wealth?   Without this stolen money he has no wealth.

c.      If employed, please specify the name and the nature of business of his/her employer?   He is not employed

d.      If self-employed, please provide name and line of business of his/her owned entity?   He is a software developer

e.      What is the relationship between your company and each counter party?   Don Stern was a consultant to Grail Semiconductor and the Niro law firm defrauded Grail with Don Stern by this transfer.

f.      Are the counter parties paying or receiving the funds on behalf of their company? Why do these counter parties (individuals) conduct business transactions through their individual accounts instead of business account?   This entire transaction is based in fraud and Grail is seeking their money back.

7.  Are similar payments with the counter parties expected to be continued?    NO

To avoid delay in or rejection of your future USD Telegraphic Transfers by our USD clearing bank, appreciate that you could provide us the requested information before 13Apr2016 by email (with each attachment at the format .JPEG or .PDF under 5MB) or by fax to (852)34184587 quoting our reference HK1160329-000358 GZC PIV.

If you have already provided the requested information, please disregard this email and accept our gratitude for your cooperation.

Should you have any questions, please contact our staff Ms Kayi Chan at (852)22882531 ext. 82856 quoting our reference HK1160329-000358.

Yours faithfully

Thank you for using HSBC

-------------------------------------
***************************************************************
This e-mail is confidential. It may also be legally privileged.
If you are not the addressee you may not copy, forward, disclose or use any part of it. If you have received this message in error, please delete it and all copies from your system and notify the sender immediately by return e-mail.

Internet communications cannot be guaranteed to be timely, secure, error or virus-free. The sender does not accept liability for any errors or omissions.
***************************************************************
"SAVE PAPER - THINK BEFORE YOU PRINT!"

2

25