

FILED

MAY - 1 2017

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

*POSTED ON WEBSITE*
*NOT FOR PUBLICATION*

# UNITED STATES BANKRUPTCY COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re: ) | Case No. 15-29890-D-7 |
| ) | |
| GRAIL SEMICONDUCTOR, ) | |
| ) | |
| Debtor. ) | |
| ―――――――――――――――――――― ) | |
| ) | |
| SHERI CARELLO, TRUSTEE, ) | Adv. Pro. No. 16-2088-D |
| ) | |
| Plaintiff, ) | Docket Control No. DNL-9 |
| ) | |
| v. ) | |
| ) | |
| DONALD STERN, et al., ) | DATE:  April 26, 2017 |
| ) | TIME:  10:00 a.m. |
| Defendants. ) | DEPT:  D |
| ―――――――――――――――――――― ) | |

## <u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

On February 24, 2017, Sheri Carello, the plaintiff in this
adversary proceeding, who is also the trustee in the underlying
chapter 7 case (the "trustee"), filed a motion for summary
judgment against defendants Donald Stern ("Stern"), Billion Hope
International, Ltd. ("BHI"), and MOM OS, LLC ("MOM")
(collectively, the "defendants"). Mr. Stern filed a declaration
in opposition, the trustee filed a reply, and Mr. Stern filed
another declaration, along with some exhibits. On April 18,
2017, Mr. Stern filed opposition.[1] Neither BHI nor MOM has filed

---

1. This opposition was filed well past the 14-day deadline
provided by the court's local rules (LBR 9014-1(f)(1)(B)) and
noticed by the trustee in her notice of hearing on the motion, as
that deadline was extended by the court's continuance of the
hearing. <u>Id.</u> Thus, the court is not bound to consider it but
(continued...)

1  opposition.[2]  For the following reasons, as to Mr. Stern, the

2  court will grant the motion as to two of the trustee's claims and

3  deny it as to two.[3]  As to BHI and MOM, the court submits to the

4  district court the following findings of fact and conclusions of

5  law, pursuant to 28 U.S.C. § 157(c)(1), with the recommendation

6  that the motion be granted as against BHI on the trustee's

7  constructive fraudulent transfer and turnover claims and denied

8  on the preference claim, and as against MOM, that the motion be

9  granted as to both the trustee's § 550(a) claim and her turnover

10  claim (in limited amounts).[4]

---

12      1. (...continued)

13  will do so because the motion is dispositive.  In terms of local
    rules, however, the court advises Mr. Stern he is required to

14  keep the court and the trustee apprised of his current address.
    Local District Court Rule 183(b), incorporated herein by LBR

15  1001-1(c).  This requirement is generally viewed as requiring the
    inclusion of a physical or at least a mailing address on all

16  documents filed with the court, yet Mr. Stern has included only a
    telephone number and email address on his documents filed in

17  opposition to this motion.  The court will require him to advise
    the court at the hearing whether his physical address is still

18  the address in the Philippines his former counsel provided upon
    counsel's withdrawal from the case, and if not, what his current

19  address is.

20      2.  In his second declaration, Mr. Stern did request that
    "all motions against myself, [BHI], [MOM] and Frank Bauder be

21  dismissed."  Stern Decl., DN 307, at 1:22-23.  This will be
    addressed briefly later in these findings and conclusions.

22
        3.  Because Mr. Stern has filed several proofs of claim in
23  the underlying bankruptcy case, the court concludes he has
    consented to adjudication of this adversary proceeding by a non-
24  Article III court.  Therefore, this court has constitutional
    authority to enter a final judgment against him.  Exec. Benefits
25  Ins. Agency v. Arkison (In re Bellingham Ins. Agency, Inc.), 702
    F.3d 553, 569 (9th Cir. 2012), aff'd, Exec. Bens. Ins. Agency v.
26  Arkison, 134 S. Ct. 2165, 2175 (2014).

27      4.  Because the court's findings and conclusions as to BHI
    and MOM depend in large part on its findings and conclusions as
28  to Mr. Stern, the court includes the latter herein, as well as
    the former.

- 2 -

Summary judgment is appropriate when there exists "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Supreme Court discussed the standards for summary judgment in a trilogy of cases: Celotex Corp. v. Catrett, 477 U.S. 317 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986); and Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986). In a motion for summary judgment, the moving party bears the initial burden of persuasion in demonstrating that no issues of material fact exist. Anderson, 477 U.S. at 255. A genuine issue of material fact exists when the trier of fact could reasonably find for the non-moving party. Id. at 248. The court may consider pleadings, depositions, answers to interrogatories, and any affidavits. Celotex at 323. To demonstrate the presence or absence of a genuine dispute, a party must cite to specific materials in the record, or submit an affidavit or declaration by a competent witness based on personal knowledge. See Fed. R. Civ. P. 56(c)(1), (4). Where the movant bears the burden of persuasion as to the claim, it must point to evidence in the record that satisfies its claim. Anderson, 477 U.S. at 252. Once the moving party has met its initial burden, the non-moving party must show specific facts demonstrating the existence of genuine issues of fact for trial. Id. at 256.

I.  The Preference Claim

By her amended complaint in this proceeding, the trustee seeks, first, to avoid and recover as a preference, pursuant to

1  §§ 547(b) and 550(a) of the Bankruptcy Code,[5] a transfer of $2.75
2  million[6] from funds of the debtor into an account of Mr. Stern
3  and BHI at The Hongkong and Shanghai Banking Corporation Ltd.
4  (the "Hong Kong bank account"), made on October 14, 2015, roughly
5  ten weeks before the debtor, Grail Semiconductor, commenced this
6  bankruptcy case as a chapter 11 case.  The trustee seeks to avoid
7  and recover the entire amount of the transfer as against Mr.
8  Stern and BHI.  The court concludes the trustee has made a prima
9  facie case that, as to Mr. Stern, the transfer was a preference;
10  as to BHI, the trustee has not made a prima facie case because
11  she has not demonstrated the payment was on account of an
12  antecedent debt owed by the debtor to BHI.

13      In a ruling on the trustee's earlier motion for a
14  preliminary injunction against Mr. Stern and BHI, a copy of which
15  is attached hereto as Exhibit A, the court made extensive
16  findings and conclusions on the trustee's preference claim,
17  ruling the trustee was likely to prevail on that claim.  The
18  court adopts herein that portion of the January 4, 2017 ruling
19  pertaining to the likelihood of success on the merits, section I.
20  Mr. Stern's opposition to the present motion consists of an 11-
21  page declaration by him and a one-page declaration with two
22  exhibits.  As the trustee points out, the 11-page declaration is
23  signed by Mr. Stern with these words:  "I declare under the laws
24  of the United States of America that the foregoing is true and

25

26      5.  Unless otherwise indicated, all statutory references are
    to the Bankruptcy Code, 11 U.S.C. §§ 101-1532.

27
28      6.  The sum actually deposited into the account was
    $2,749,981.60.  The $18.40 difference apparently represented a
    wire transfer fee.

- 4 -

correct" (Stern Decl., DN 294 ("Decl."), at 11:22-23) and without

the requisite "under penalty of perjury." See 28 U.S.C. § 1746.

However, even if Mr. Stern had included those words, the

declaration would be unavailing.  It consists virtually entirely

of opinions and conclusions that are unsupported by any

admissible evidence.  Mr. Stern provides a rather extensive

recital of his version of the history of the debtor company and

his contributions to it.  Assuming without deciding that this

history is accurate, it is simply not relevant to the trustee's

claims in this adversary proceeding.  Mr. Stern misunderstands

the issue of "value" as it relates to whether a transfer was a

preference.  The question is not whether the transfer was made in

exchange for value previously given by the recipient to the

debtor; it is whether the recipient either (1) gave new value to

the debtor at or about the same time as the transfer was made to

the recipient (§ 547(c)(1)); or (2) gave new value to the debtor

after the transfer was made to the recipient.  § 547(c)(4).

Thus, Mr. Stern's protests about the trustee's allegations,

while understandable from his perspective, are not relevant here.

Mr. Stern argues:  "The Trustee now claims that Donald Stern has

given Grail no value to Grail!!!  If not for Donald Stern there

would have been no trial, no jury verdict for $124 million

dollars in favor of Grail, no settlement and no $55 million

dollars.  To say there is no value in the consulting agreement

and now after five year[s] of work and to just void the agreement

is beyond stupid."  Decl. at 6:19-22.  Accepting as true, for

purposes of this motion only, Mr. Stern's testimony regarding the

work he did and his conclusion that it led to the settlement, the

- 5 -

1  problem is that all of the work was done prior to the date of the

2  transfer at stake in this proceeding.  As such, his testimony and

3  conclusions do not support a finding that Mr. Stern either gave

4  new value to the debtor contemporaneously with the challenged

5  transfer or gave new value to the debtor after that transfer was

6  made.[7]

7       Mr. Stern also attempts to shore up his theories, raised in

8  response to the trustee's earlier preliminary injunction motion,

9  that the debtor was not insolvent at the time of the transfer and

10  that the transfer did not enable Mr. Stern to receive more than

11  he would have received in a hypothetical chapter 7 liquidation.

12  The court addressed these issues in its earlier ruling adopted

13  herein, but will address Mr. Stern's more expansive analysis

14  here.  The court notes, to begin with, that there is a

15  presumption in the trustee's favor that the debtor was insolvent

16  when the transfer was made.  § 547(f); In re Koubourlis, 869 F.2d

17  1319, 1322 (9th Cir. 1989).  Thus, Mr. Stern must come forward

18  with some evidence to rebut the presumption.  Id.

19       Mr. Stern's solvency analysis centers on the proposition

20  that the Mitsubishi settlement funds were sufficient to enable

21  the debtor to settle all claims against it.

22

23 ──────────────

       7.  Mr. Stern alludes briefly to the debtor's Chief
24  Resolution Officer, Michael Burkart, as having "worked with
   Donald Stern and many others for many months asking for documents
25  and investing [sic] the history behind each claimant."  Decl. at
   10:27-11:1.  Mr. Stern makes this statement not in support of any
26  theory that he gave new value to the debtor after the transfer,
   but as support for his requested removal of the trustee (see
27  below), but in any event, the statement is far too conclusory to
   support the theory that the assistance Mr. Stern provided to Mr.
28  Burkart qualifies as new value for purposes of a defense to the
   preference claim.

1　　　　　　Donald would have never agreed to settle if Hofer the
　　　　　　CEO, Woods the CFO and Ret. Judge Gilbert a Director of
2　　　　　　Grail had not assured Donald that the settlement was
　　　　　　<u>enough to settle</u> all claims and that bankruptcy was not
3　　　　　　necessary as discussed during the settlement
　　　　　　conference.　Hofer and Gilbert stated during the
4　　　　　　settlement that they had talked to many of the people
　　　　　　and that with a little work together <u>they would get</u>
5　　　　　　<u>everyone to agree to settle</u>.　As Brad Woods stated in
　　　　　　his May 5, 2016 declaration to this court in section 7
6　　　　　　lines 18-19:

7　　　　　　　　　　"<u>Certain creditors did agree to reduce their</u>
　　　　　　　　　　<u>claims</u>, albeit orally, and it was understood that
8　　　　　　　　　　<u>further reductions would have to be made by other</u>
　　　　　　　　　　<u>claimants</u>.　This resulted in the settlement of $55
9　　　　　　　　　　million to be agreed upon."

10　Decl. at 6:22-7:4 (emphasis added).　Mr. Stern has not suggested

11　the Mitsubishi settlement would have enabled the debtor to pay

12　off all its debts at their actual amounts.　He has offered no

13　authority for a definition of "insolvent," for purposes of § 547,

14　as being unable to settle one's claims at compromised amounts,

15　and the court is aware of none.　In fact, Mr. Stern's analysis is

16　tantamount to an admission that the debtor was insolvent, based

17　on the traditional balance sheet test,[8] when the transfer was

18　made.

19　　　　　Also on the question of solvency, in his April 18, 2017

20　opposition, Mr. Stern refers to alleged testimony by Judge

21　Richard Gilbert that after the Mitsubishi settlement, "he was

22　looking forward to paying a dividend to Grail's shareholders"

23　(Stern Opp., DN 325 ("April 18, 2017 Opp."), at 4:9-10) and to a

24　declaration filed in the parent case last year in which Michael

25　Burkart "describes in detail why many of the claims are invalid .

26

27　　　　　8.　<u>See</u> § 101(32)(A); <u>Koubourlis</u>, 869 F.2d at 1321; <u>DC Media</u>
28　<u>Capital, LLC v. Imagine Fulfillment Servs., LLC</u>, 2014 Bankr.
　　LEXIS 3369, *16 (9th Cir. BAP 2014).

. . ." _Id._ at 7:2.  The trustee submitted the transcript of

Judge Gilbert's deposition earlier in this adversary proceeding;

thus, she apparently would not object to the court considering

it.  However, Mr. Stern has not cited the testimony by page

number so the court might consider it in context, and in any

event, the hope of returning a dividend to shareholders appears

to be a matter of pure speculation.  Mr. Burkart's testimony was

given on information and belief and was not otherwise

authenticated or supported; the declaration is thus inadmissible.

Finally, Mr. Stern refers to "[b]oth Gilbert and Woods

confirm[ing] . . . in their declarations and depositions that

Grail is and was solvent." _Id._ at 14:20-21.  Mr. Stern has not

provided citations to these declarations and depositions and the

court is not required to dig through the record to find them.

Even if such testimony were properly cited, however, the court

would be hard-pressed to find it anything but highly speculative

and contrary to the evidence cited above that the debtor's

"solvency" depended entirely on speculative settlements and

concessions by creditors.  Mr. Stern's characterization of all of

this testimony carries no weight as regards this motion.

Moving on to the "greater amount test," Mr. Stern begins by

setting forth at some length his own priority scheme; that is,

the order in which, in his opinion, various claims should be

paid.  As with his value analysis, Mr. Stern's priorities are

simply not relevant here.  The issue is whether the transfer

enabled him to receive more than he would have received had the

transfer not been made, had the debtor been liquidated in a

hypothetical chapter 7 case, and had Mr. Stern received payment

"to the extent provided by the provisions of [Title 11]." §
547(b)(5)(C). The priorities that matter here are the Code's
priorities, not those Mr. Stern would find fair. In making the
analysis, the court is to consider whether the transfer enabled
Mr. Stern to receive more than he would have received if the
transfer had not been made and he had instead received only what
other creditors in his class would have received in a
hypothetical chapter 7 case. <u>Alvarado v. Walsh (In re LCO
Enters.)</u>, 12 F.3d 938, 941 (9th Cir. 1993). Mr. Stern's personal
priorities notwithstanding, his claims are general unsecured
claims.

    As a general proposition, unless the hypothetical chapter 7
case would have resulted in a 100% distribution to general
unsecured creditors, a general unsecured creditor who receives a
pre-petition transfer in any amount inevitably receives more
through that transfer than he would have received if the transfer
had not been made and he had instead received payment through the
hypothetical chapter 7 case, on a pro rata basis with the other
members of his class. This is because the pre-petition transfer
resulted in him receiving that payment <u>plus</u> his pro rata share of
the hypothetical chapter 7 distribution. That is, the creditor
who receives a pre-petition transfer <u>and</u> a distribution through
the chapter 7 has necessarily received more than the creditors in
the same class who receive distributions only through the chapter
7.

    Thus, the question here is not what Mr. Stern received on
October 14, 2015, as compared with what other creditors in the
same class are likely to receive through this case; it is what he

- 9 -

1   received on October 14, 2015 <u>plus</u> what he will receive through

2   this case, as compared with what general unsecured creditors who

3   did not receive pre-petition payments will receive through the

4   case.

> This analysis requires that in determining the amount
> that the transfer "enables [the] creditor to receive,"
> 11 U.S.C. § 547(b)(5), such creditor must be charged
> with the value of what was transferred *plus* any
> additional amount that he would be entitled to receive
> from a Chapter 7 liquidation.  The net result is that,
> as long as the distribution in bankruptcy is less than
> one-hundred percent, any payment "on account" to an
> unsecured creditor during the preference period will
> enable that creditor to receive more than he would have
> received in liquidation had the payment not been made.

11  <u>In re Lewis W. Shurtleff, Inc.</u>, 778 F.2d 1416, 1421 (9th Cir.

12  1985), citing <u>Palmer Clay Products Co. v. Brown</u>, 297 U.S. 227,

13  229 (1935).  For example, "[w]here the creditor's claim is

14  $10,000, the payment on account [the pre-petition payment] $1000,

15  and the distribution in bankruptcy 50%, the creditor to whom the

16  payment on account is made receives $5500, while another creditor

17  to whom the same amount was owing and no payment on account was

18  made will receive only $5000." <u>Lewis W. Shurtleff, Inc.</u>, at

19  1421, quoting <u>Palmer Clay Products</u>, at 229; <u>see also</u> <u>Estate of</u>

20  <u>Love v. First Interstate Bank (In re Love)</u>, 155 B.R. 225, 232

21  (Bankr. D. Mont. 1993).

22      Mr. Stern calculates his total claims, including the claim

23  on account of which he received the $2.75 million payment, at

24  something over $9 million.  If he had not received that payment,

25  he would receive on account of his $9 million in claims the same

26  pro rata distribution other general unsecured creditors will

27  receive.  But as a result of the $2.75 million payment, he has

28  already received 30% of the total of his claims.  If the payment

is not avoided and returned to the estate, it would necessarily elevate his total receipts on his claims to 30% more than the other members of his class will receive – the ones who did not receive pre-petition payments.  Whether the court considers the roughly $50 million in claims that have been filed in this case or the total assets and liabilities scheduled by Mr. Burkart on the debtor's schedules, $11,596,812 and $18,744,843, respectively, there is, at this stage, no foreseeable scenario in which this case will result in a 100% distribution on general unsecured claims.  Further, the court has no reason to believe a hypothetical liquidation of the debtor's assets as of the petition date would have been 100%.  As a result, the trustee has made a prima facie showing on the "greater amount" test and Mr. Stern has not rebutted it.

Mr. Stern has submitted a list of the claims filed in this case, with his opinion as to whether each one is valid or invalid.  He has added brief remarks for each, apparently to explain his opinions.[9]  He has also submitted a one-page analysis in which he concludes "[t]here is $1,071,138 in valid claims without taking any of Don's [Stern's] claims into consideration.  Don's valid claims total at least $5,313,548" (Stern's Ex. A, DN

---

9.  His motivation for preparing the list was apparently the following language in the court's January 4, 2017 ruling, which he quotes in his April 18, 2017 opposition:  "Mr. Stern objects that the claims are 'grossly overstated' (Evid. Objs., ¶ 2) but does not suggest which ones or in what amounts and he offers no evidence."  Mr. Stern states he has now "performed an analysis of all the claims on the Registrar for [the parent case] and specif[ied] which claims are invalid with supporting evidence." April 18, 2017 Opp., DN 325, at 3:25-26.

309, p. 3), not including the contested $2.75 million.[10]  He

includes an analysis of what he believes are the estate's valid

claims against others, including law firms, a litigation finance

company, a former director of the debtor, and a former officer.

He concludes, "[t]he estate has approximately $3,000,000.  That

is enough to cover the valid claims – excluding Don's – and still

leave some money to pay Sedgwick [a litigation finance company]

and Woods [a former officer] if necessary."  Id.

Mr. Stern's analysis of the claims against the estate and

the estate's claims against others is general, conclusory, and

unsupported by admissible evidence other than his opinions.  The

court recognizes that his opinions are based on an apparently

extensive knowledge of the debtor, the claims against it, and its

claims against others.  However, his opinions are far too vague

and conclusory for the court to afford them much weight, if any.

The court is aware that in addition to the "valid/invalid"

list, Mr. Stern, between April 18 and April 20, 2017, also filed

some 28 objections to claims in the parent case.[11]  The objections

were not filed in opposition to this motion and were not,

---

10.  Mr. Stern has filed as an exhibit a declaration of
Michael Burkart filed three months into the parent case, in which
Mr. Burkart analyzed the various alleged misdeeds of the debtor's
former director, Ronald Hofer.  Mr. Stern claims the declaration
supports his conclusion that the claims of Mr. Hofer and former
officer Brad Woods should be disallowed.  The allegations in Mr.
Burkart's declaration are made on information and belief and are
not otherwise authenticated or supported.  The declaration is
thus inadmissible.

11.  On each, he listed a hearing date of April 26, 2017,
which does not comply with the court's local rule regarding the
amount of notice required to be given of objections to claims
(LBR 3007-1(b)), and the objections are not accompanied by
notices of hearing or proofs of service.  For these reasons, the
objections will not be calendared.

1  apparently, served on the trustee; thus, the court need not

2  consider them.  At this stage, the claims are presumptively valid

3  (Fed. R. Bankr. P. 3001(f)) and the claimants have had no

4  opportunity to respond to the objections.  The court has,

5  however, considered the objections to the extent of determining

6  them to be based largely on Mr. Stern's opinions and conclusions,

7  with documents attached to some of them (but not all) that are

8  hearsay and unauthenticated.  The court notes also that between

9  the "valid/invalid" list Mr. Stern filed March 23, 2017 and the

10 version of the same list he filed April 18, 2017, Mr. Stern

11 changed eight of the claims from valid to invalid, which by

12 itself casts doubt on the reliability of his conclusions.

13 Finally, his conclusion that of more than $50 million in claims

14 filed, only $546,338 are valid (not including Mr. Stern's) is

15 self-serving and seems almost per se not credible.

16      In addition, Mr. Stern's conclusion that "[t]he trustee need

17 not sue [the law firms] in order to deny their claims" but can

18 simply deny them represents a misunderstanding of the claims

19 objection process and thereby improperly discounts the

20 substantial administrative expenses that would inevitably be

21 incurred in challenging claims against the estate (as well as

22 pursuing claims of the estate against others).  In short, Mr.

23 Stern's "evidence," to the extent, if any, it is admissible at

24 all, is entitled to very little weight and is far from sufficient

25 to overcome the conclusion that the $2.75 million transfer

26 enabled him to receive more than he would have received if the

27 transfer had not been made and he had received payment only

28 through a hypothetical chapter 7.

1    Finally, Mr. Stern has expanded his argument, originally
2 made in opposition to the trustee's preliminary injunction
3 motion, that the $2.75 million transfer was made in the ordinary
4 course of business.

5        If the payment of legal consulting services is not a
        normal course of business of ligation [sic] then all
6        ligation [sic] awards are subject to avoidance and no
        lawyers or experts should ever be paid!  If the law
7        allows that lawyer's and not their experts to be paid
        up front of all other outstanding company expenses then
8        it is unfair to the company and favors lawyers over all
        others.  Niro's retainer agreement and Stern consulting
9        agreement together were approved by the board of
        Director of Grail requiring that Stern be available
10       (i.e. a consultant) to the lawyers for the express
        purpose of supporting the legal process.  Stern's
11       consultant [agreement] is part of legal business of
        ligating [sic] the case.
12 .

13 Decl. at 9:15-22.

14    The court's ruling on the preliminary injunction motion
15 included, in the section adopted herein, an extensive discussion
16 of the circumstances under which the $2.75 million transfer was
17 made, along with the court's conclusion, based on the record at
18 that time, that there was nothing ordinary about the transfer.
19 Mr. Stern's opinion that payments to consultants assisting
20 attorneys in litigation should be considered as much a part of
21 the "ordinary course of business" of litigation as the attorney's
22 fees does not support a contrary conclusion.  Mr. Stern has
23 offered no authority for the proposition, essential to his
24 argument, that litigation after a debtor has ceased operations,
25 with no prospect of resuming such, at a time when everyone is
26 aware the debtor is not able to pay all its creditors without
27 significant concessions on their part, constitutes the ordinary
28 course of business of any company.  Thus, and as further set

forth at length in the court's earlier ruling, the $2.75 million payment to Mr. Stern was not made in the ordinary course of business.

Therefore, the court concludes the trustee has made a prima facie case that there is no genuine dispute as to any material fact concerning her preference claim and the trustee is entitled to judgment as a matter of law. That is to say, the trier of fact could not reasonably find for Mr. Stern on the preference claim. Because the transfer will be avoided, and as MOM has submitted no opposition, the trustee is also entitled to judgment on her § 550(a)(2) claim against MOM, as a transferee of initial transferee Stern, limited to $400,000, the total amount transferred to MOM.

## II. The Actual Fraudulent Transfer Claims

Next, the trustee seeks summary judgment on her actual fraudulent transfer claims against Mr. Stern and BHI under § 548(a)(1)(A) and California's version of the Uniform Fraudulent Transfer Act, Cal. Civ. Code §§ 3439 – 3439.14. Under both, a bankruptcy trustee may avoid a transfer made within a particular time period if the transfer was made by the debtor with the actual intent to hinder, delay, or defraud any of its creditors. § 548(a)(1)(A); Cal. Civ. Code § 3439.04(a)(1). The trustee refers to the "badges of fraud" from which the court may infer fraudulent intent to hinder, delay, or defraud creditors (see Acequia, Inc. v. Clinton (In re Acequia, Inc.), 34 F.3d 800, 805–06 (9th Cir. 1994)), and concludes, "[t]he confluence of the $1.9 million Mishcon judgment, the unresolved $2.1 million lien claim of the Schwartz Predecessors, the Debtor's insolvency in excess

1  of $7 million, the special relationship between Raymond Niro and
2  his client, and the insider status of [Mr. Stern] as a Director,
3  are conclusive evidence of intent to defraud." Trustee's Memo.,
4  DN 268 ("Memo."), at 6:10-14. The trustee does not specify whose
5  intent she is referring to.

6      The focus of the inquiry, for purposes of an actual
7  fraudulent transfer, is on the intent of the transferor; that is,
8  the intent of the debtor. Thus, "Plaintiff may avoid a transfer
9  of the debtor in property, if the debtor made such transfer with
10 actual intent to hinder, delay, or defraud a creditor." Diamond
11 v. Empire Partners, Inc. (In re Empire Land, LLC), 2016 Bankr.
12 LEXIS 1088, *24 (Bankr. C.D. Cal. 2016), citing § 548(a)(1)(A);
13 Cal Civ. Code § 3439.04(a)(1). "[T]he relevant 'fraudulent
14 intent' in a fraudulent transfer action is the transferor's
15 fraudulent intent--not the defendant transferee's." Pioneer
16 Liquidating Corp., 211 B.R. 704, 714 (S.D. Cal. 1997). "The
17 focus is on the intent of the transferor." Wolkowitz v. Beverly
18 (In re Beverly), 374 B.R. 221, 235 (9th Cir. BAP 2007); see also
19 Plotkin v. Pomona Valley Imports (In re Cohen), 199 B.R. 709, 716
20 (9th Cir. BAP 1996) ["The focus in the inquiry into actual intent
21 is on the state of mind of the debtor."]; Empire Land, LLC, 2016
22 Bankr. LEXIS 1088 at *24; Weil v. United States (In re Tag Entm't
23 Corp.), 2016 Bankr. LEXIS 982, *42 (Bankr. C.D. Cal. 2016). The
24 trustee offers no analysis of the debtor's intent when the
25 transfer was made.

26      There is an exception to this general rule. "Generally, the
27 party attacking the transfer must show the debtor/transferor
28 acted with actual intent to hinder, delay, or defraud when

1    engaging in the transfer.  However, in cases where the transferee
2    controls or is in a position to control the debtor/transferor's
3    disposition of its property, then the transferee's intent can be
4    imputed to the debtor/transferor."  <u>Greenspan v. Orrick,</u>
5    <u>Herrington & Sutcliffe LLP (In re Brobeck, Phleger & Harrison</u>
6    <u>LLP)</u>, 408 B.R. 318, 339 (Bankr. N.D. Cal. 2009), citing <u>Acequia,</u>
7    <u>Inc.</u>, 34 F.3d 800, at 806, in turn quoting <u>In re Roco Corp.</u>, 701
8    F.2d 978, 984 (1st Cir. 1983) ["We may impute any fraudulent
9    intent of [the transferee] to the transferor [the debtor]
10   because, as the company's president, director, and sole
11   shareholder, he was in a position to control the disposition of
12   its property."].

13       The court is not persuaded the exception applies here, where
14   Mr. Stern was a director of the debtor but the day or the day
15   after he caused the transfer to be made, two other directors
16   deadlocked as to whether to allow the transfer and tabled the
17   matter to allow for the appointment of a provisional director,
18   presumably to break the tie.  In other words, it does not appear
19   Mr. Stern had sufficient control over the debtor at the time of
20   the transfer that his intent should be imputed to the debtor.
21   For this reason, as to the trustee's claims for avoidance and
22   recovery of an actual fraudulent transfer, the motion will be
23   denied.

24   III.  The Constructive Fraudulent Transfer Claims

25       The trustee also seeks summary judgment on her constructive
26   fraudulent transfer claims against Mr. Stern and BHI, under both
27   bankruptcy and California law (§ 548(a)(1)(B); Cal. Civ. Code §
28   3439.04(a)(2)).  The motion will be denied as to Mr. Stern

because, as part of her case-in-chief, the trustee must demonstrate the debtor received less than a reasonably equivalent value in exchange for the transfer (§ 548(a)(1)(B)(i); § 3439.04(a)(2)), whereas the debtor received reasonably equivalent value in the form of the satisfaction of the debtor's debt to Mr. Stern under his Consulting Agreement. For purposes of the fraudulent transfer statutes, "value" includes "satisfaction . . . of a present or antecedent debt of the debtor . . . ." § 548(d)(2)(A); Cal. Civ. Code § 3439.03. "Under this definition [§ 548(d)(2)(A)], payment of a preexisting debt is value, and if the payment is dollar-for-dollar, full value is given. Therefore, to the extent a transfer constitutes repayment of the debtor's antecedent or present debt, the transfer is not constructively fraudulent." Official Comm. of Unsecured Creditors v. Hancock Park Capital II, L.P. (In the Fitness Holdings Int'l, Inc.), 714 F.3d 1141, 1145-46 (9th Cir. 2013). The same is true under Cal. Civ. Code § 3439.03. In re Prejean, 994 F.2d 706, 707, n.2 (9th Cir. 1993).

The trustee admits in her memorandum in support of this motion that certain elements of her preference claim "are not in dispute." Memo. at 4:20. Among those she acknowledges are not in dispute is that the transfer was made "for or on account of an antecedent debt owed by the debtor before [the] transfer was made." § 547(b)(2). Because this requirement often conflicts in a given fact situation with § 548(d)(2)(A) and Cal. Civ. Code § 3439.03, a transfer successfully challenged by a bankruptcy trustee is generally either a preference or a constructive fraudulent transfer, but not both. Here, however, the trustee

1  seeks to have it both ways – she acknowledges that, for purposes

2  of her preference claim, the $2.75 million payment was made in

3  satisfaction of an antecedent debt, but she also seeks judgment

4  on her constructive fraudulent transfer claim on the basis of

5  "the Debtor's insolvency and non-receipt of reasonable value in

6  exchange . . . ." Memo. at 6:25-26.

7        In support of her earlier preliminary injunction motion, the

8  trustee claimed the Consulting Agreement between the debtor and

9  Mr. Stern on which the $2.75 million transfer was based[12] was

10 ratified after Mr. Stern's cousin, Robert Stern, claimed he had

11 been wrongfully ousted from the debtor's board of directors.  The

12 trustee also claimed Mr. Stern waived his 5% claim at a board

13 meeting in February of 2015.  The trustee does not mention these

14 allegations in connection with the present motion, but in any

15 event, the trustee has not submitted sufficient admissible

16 evidence to carry her burden of demonstrating the debt to Mr.

17 Stern was not owed.[13]  (The trustee's analysis of the law and

18 facts supporting this motion is less than exemplary.)

19       BHI, on the other hand, was owed no debt by the debtor – as

20 far as the record reveals, that entity was a complete stranger to

21 the debtor.  Although the trustee has not addressed this issue,

22 the court has no reason to believe the debtor received anything

23

24    12.  The Consulting Agreement provided for a monthly salary
   to Mr. Stern, as well as a payment equal to 5% of the gross
25 proceeds of the Mitsubishi litigation.  The amount transferred to
   Mr. Stern in October of 2015, $2.75 million, is 5% of the gross
26 Mitsubishi settlement amount, $55 million.

27    13.  As indicated above, it is a part of the trustee's case-
   in-chief to demonstrate that the debtor did not receive a
28 reasonably equivalent value in exchange for the transfer.  §
   548(a)(1)(B)(i); § 3439.04(a)(2).

- 19 -

of value from BHI in exchange for the transfer.  (Mr. Stern makes
no such allegation.)  As the court has already found that the
trustee has met her burden of demonstrating the debtor was
insolvent when the transfer was made, the trustee has satisfied
both elements of her constructive fraudulent transfer claim
against BHI, and the court will recommend to the district court
that the motion be granted as to that claim.

## IV.   The Claim for Turnover

Finally, the trustee seeks summary judgment on her claim for
turnover, as against Mr. Stern, BHI, and MOM.  Section 542(a)
provides that "an entity, other than a custodian, in possession,
custody, or control, during the case, of property that the
trustee may use, sell, or lease under section 363 . . . shall
deliver to the trustee, and account for, such property or the
value of such property, unless such property is of
inconsequential value or benefit to the estate."  Certainly,
$2.75 million is not of inconsequential value or benefit, nor is
the $400,000 MOM received as the transferee of Mr. Stern and BHI.

The trustee has not alleged the defendants, or any of them,
remains in possession, custody, or control of the transferred
funds.  However, the Ninth Circuit has held that "§ 542(a) allows
a turnover motion to be brought against the entity at any time
during the pendency of the bankruptcy case, even if the entity no
longer possesses or has custody or control over the property, at
the time the motion is filed."  Shapiro v. Henson, 739 F.3d 1198,
1200 (9th Cir. 2014).  Thus, "during the case," as used in §
542(a), "means that the trustee may bring a motion for turnover
against an entity who has possession of the property of the

- 20 -

estate, or had possession of that property at some point during the bankruptcy case." Id. The trustee has submitted nothing with this motion to show the amount that remained in the possession, custody, or control of the defendants, or any of them, "during the case."

The court has, however, examined the bank statements the trustee filed in support of the earlier preliminary injunction motion, and finds that as of the petition date, December 30, 2015, there was $1,162,769.44 in the Hong Kong bank account, which the court finds to have been in the control of Mr. Stern and BHI. That amount remained in the account until January 14, 2016, when another $310,000 was withdrawn. There is no indication the balance in the account ever went back up to $1,162,769.44; thus, the court concludes that, during the case, Mr. Stern and BHI were in control of $1,162,769.44, and the trustee is entitled judgment for turnover against them for that amount.[14] The trustee submitted evidence in support of the earlier motion that $90,000 was transferred from the Hong Kong account to MOM on October 20, 2015, but no evidence as to how much remained in MOM's possession, custody, or control as of the petition date, December 30, 2015. There is evidence of another transfer out of the account to MOM, this one in the amount of $310,000, post-petition, on January 14, 2016. Thus, the court finds that, during the case, MOM was in possession, custody, or

---

14. To the extent the trustee argues that the amount remaining in Mr. Stern's control includes funds transferred to Digerati Limited, MOM, or Mr. Stern himself, in some other bank account or via some other entity, the court finds that insufficient evidence has been presented in this adversary proceeding to support that conclusion at this time.

1  control of $310,000, and the court will grant the trustee's

2  motion as against MOM on her turnover claim for that amount.[15]

3  Mr. Stern concludes his argument by charging the court with

4  failing to hear the issues concerning the Consulting Agreement,

5  of prejudging the case without a trial, of finding him guilty

6  until proven innocent, and of putting itself above the Fourth

7  Amendment to the United States Constitution.  He claims that if

8  the trustee prevails, he will be left penniless and sitting in

9  jail "as a reward for the 17 years of work he did for Grail

10 protecting its shareholders."  Decl. at 10:12-13.  The court has

11 some sympathy, as it is common for persons on the receiving end

12 of preferences and fraudulent transfers to have trouble

13 understanding why they are being ordered to return what they had

14 managed to recover.  Nevertheless, the bankruptcy laws (and state

15 law as regards fraudulent transfers) are designed with a view to

16 treating all creditors in a given class on an equal basis.  Mr.

17 Stern's conduct as regards the $2.75 million transfer plainly had

18 the opposite effect.  To the extent Mr. Stern's argument is

19 intended as a good faith defense, (1) good faith is not a defense

20

21    15.  The trustee's argument for her turnover claim is
devoted primarily to Illinois rules and case law concerning an
22 attorney's duties with respect to client funds held in a trust
account.  This is apparently in reference to an argument in the
23 defendants' opposition to the preliminary injunction motion that
attorney Raymond Niro, who received the $55 million in settlement
24 funds from Mitsubishi, was required by the Illinois Rules of
Professional Conduct to honor the Consulting Agreement between
25 the debtor and Mr. Stern.  The court does not agree with the
defendants, and agrees with the trustee that the $2.75 million
26 transferred out of Mr. Niro's trust account into the Hong Kong
bank account, at Mr. Stern's instruction, were property of the
27 debtor and, as of the petition date, property of the estate.
Thus, the funds are subject to turnover under § 542(a) to the
28 extent, as indicated above, they were in the possession, custody,
or control of the defendants at some time during the case.

- 22 -

1 | to a preference claim, only to a fraudulent transfer claim; and
2 | (2) the court has found in Mr. Stern's favor on the fraudulent
3 | transfer claims.

4 | The court has found against BHI on the constructive
5 | fraudulent transfer claim. Although Mr. Stern, who is not an
6 | attorney, cannot represent BHI in this proceeding (or MOM or Mr.
7 | Bauder), it might be argued he and BHI are alter egos of each
8 | other. Thus, in the interest of thoroughness, the court will
9 | construe Mr. Stern's arguments as being made on behalf of BHI, as
10 | to good faith, and finds, based on the facts set forth in the
11 | third through seventh paragraphs of section II of the court's
12 | January 4, 2017 ruling, which paragraphs the court adopts herein,
13 | that Mr. Stern has not come forward with evidence showing the
14 | existence of genuine issues of fact for trial. "When the moving
15 | party has carried its [initial] burden under Rule 56(c), its
16 | opponent must do more than simply show that there is some
17 | metaphysical doubt as to the material facts." Matsushita Elec.
18 | Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)
19 | (footnote omitted; citations omitted). "A genuine dispute arises
20 | if the evidence is such that a reasonable jury could return a
21 | verdict for the nonmoving party." California v. Campbell, 319
22 | F.3d 1161, 1166 (9th Cir. 2003). A scintilla of evidence or
23 | evidence that is merely colorable or not significantly probative
24 | does not present a genuine issue of material fact." United Steel
25 | Workers of America v. Phelps Dodge Corp., 865 F.2d 1539, 1542
26 | (9th Cir. 1989).

27 | For the reasons set forth above, the motion will be granted
28 | in part and judgment will be entered on the trustee's preference

- 23 -

claim, as against Mr. Stern, and the October 14, 2015 transfer of $2,749,981.60 will be avoided. The court submits these findings of fact and conclusions of law to the district court with the recommendation that judgment be entered on the trustee's constructive fraudulent transfer claim, as against BHI, and that judgment be entered against MOM under § 550(a) in the amount of $400,000. In addition, judgment will be entered on the trustee's claim for turnover, as against Mr. Stern, in the amount of the $1,162,769.44 remaining in the account as of the petition date, or its value. The court recommends to the district court that judgment be entered against BHI on the turnover claim in the same amount and against MOM in the amount of the $310,000 transferred to it after the petition date.

Dated: April 28, 2017

_Robert Bardwil_
ROBERT S. BARDWIL
United States Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF CALIFORNIA
### CIVIL MINUTES

**Case Title :**   GRAIL SEMICONDUCTOR     **Case No :**  15-29890-D-7
CARELLO V. STERN ET AL          **Adv:**       16-2088
**Date :**      1-4-17
**Time :**      10:00 A.M.

**Matter :**     [138] CONTINUED MOTION FOR PRELIMINARY INJUNCTION [DNL-4]

**Judge :**            **Robert Bardwil**
**Courtroom Deputy :**  **Nancy Williams**
**Reporter :**         **DIAMOND REPORTERS**
**Department :**        **D**

**APPEARANCES for:**
**Movant(s) :**
     ATTORNEY RUSSELL CUNNINGHAM FOR PLAINTIFF
**Respondent(s) :**
     ATTORNEY MATT OLSON FOR CREDITOR, ATTORNEY IAIN MACONDALD
FOR CREDITOR (PHONE)

## CIVIL MINUTES

### MOTION WAS GRANTED

### ORDER TO BE SUBMITTED BY MOVING PARTY

        Final ruling:

    This is the motion of the plaintiff, Sheri L. Carello, who is
also the chapter 7 trustee in the bankruptcy case in which this
adversary proceeding is pending (the "trustee"), for a preliminary
injunction against defendants Donald Stern ("Mr. Stern") and Billion
Hope International, Ltd. ("BHI"). Mr. Stern and BHI, together with
their co-defendants, Frank Bauder and MOM OS, LLC ("MOM"),[1] have filed
opposition and the trustee has filed a reply.[2] For the following
reasons, the court will grant the motion.

    To begin with, the defendants have filed evidentiary objections

*EXHIBIT A*

to the declarations of Brad Woods and the trustee in support of the motion. Although the objections run for 9 and 23 pages, respectively, they are summary in nature with no analysis.3 There is a column in which the defendants list their "contradictory facts," if any; however, the majority of the allegations in that column are themselves unsupported by any admissible evidence 4 or are nothing more than argument. In addition, the evidence the defendants themselves have submitted – the declarations of Mr. Stern and the defendants' current counsel and their exhibits – includes much that would be inadmissible under the rules of evidence. For that reason, and because the rules of evidence are more relaxed on a motion for a preliminary injunction than they would be at trial,5 the court will overrule the objections for the purpose of considering this motion. The court notes, however, that it relies most heavily in this decision on evidence the truth of which the defendants do not challenge, although they may challenge it on technical grounds. (The court will provide examples below.) The court concludes that the evidence it relies on is supported by a sufficient foundation and sufficiently authenticated to make it appropriate for consideration on a motion for a preliminary injunction.

By her amended complaint in this proceeding, the trustee seeks to avoid and recover a transfer of some $2.75 million made, allegedly at Mr. Stern's direction, from funds of the debtor into an account of Mr. Stern and BHI at The Hongkong and Shanghai Banking Corporation Ltd. (the "Bank") on October 13, 2015, roughly ten weeks before the debtor, Grail Semiconductor, commenced this bankruptcy case as a chapter 11 case.6 The court has previously issued in the trustee's favor a right to attach order and order for issuance of a writ of attachment against the funds in the account. The trustee now seeks a preliminary injunction enjoining Mr. Stern and BHI from disposing of any of the funds on deposit with the Bank and directing Mr. Stern and BHI to turn over the funds to the court or a receiver or to otherwise place the funds in a blocked account in a United States bank – an account from which the funds would be authorized to be disbursed only on further court order following trial or other resolution of this adversary proceeding.

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." <u>Winter v. NRDC, Inc.</u>, 555 U.S. 7, 20 (2008). The <u>possibility</u> of irreparable harm is insufficient; instead, the plaintiff must persuade the court that absent an injunction, irreparable harm is <u>likely</u> to occur. <u>Id.</u> at 22. "[A] stronger showing of one element may offset a weaker showing of another. For example, a stronger showing of irreparable harm to plaintiff might offset a lesser showing of likelihood of success on the merits." <u>Alliance For The Wild Rockies v. Cottrell</u>, 632 F.3d 1127, 1131 (9th Cir. 2011).

## I.  Likelihood of Success on the Merits

    As against Mr. Stern and BHI, the trustee seeks to avoid and
recover the transfer as a preference and/or an actual and/or
constructive fraudulent conveyance.  As against MOM and Mr. Bauder,
the trustee seeks to recover, under § 550 of the Bankruptcy Code,
those portions of the transfer later transferred to them.  As against
all the defendants, the trustee seeks turnover of the transferred
funds.  The elements of the preference cause of action 7 are well-known
to bankruptcy practitioners and there is no need to repeat them here.
The court will therefore assess the facts likely to be demonstrated by
the trustee in light of the relevant elements.  Because the court
finds the trustee is likely to prevail on her preference claim, the
court need not reach her other claims.

    There is no dispute that the transfer was made within one year
prior to the debtor's bankruptcy filing and that it was made to an
insider, Mr. Stern.  There appears to be no dispute that the transfer
was a transfer of an interest of the debtor in property and that it
was made to or for the benefit of a creditor, namely Mr. Stern, on
account of an antecedent debt, namely the debtor's obligation to Mr.
Stern under a Consulting Agreement entered into in 2011.  Thus, it
appears to be undisputed that four of the six elements of an avoidable
preference are present in this case.

    Mr. Stern disputes in conclusory terms only the next element –
that the debtor was insolvent when the transfer was made and the
evidence strongly suggests the trustee will prevail on this point as
well.8  The debtor's schedules, signed and presumably prepared by the
debtor's Chief Resolution Officer, whom Mr. Stern considers an "an
esteemed bankruptcy trustee" (Opp. at 2:27), list assets totaling
$11,596,812 and liabilities totaling $18,744,843.  Mr. Burkart was
careful to list the dates incurred for most of the liabilities;
although some of those dates or time periods refer to "2015"
generally, it appears few, if any, of the debts were incurred between
the date of the transfer to Mr. Stern and BHI, October 14, 2015, and
the petition date, December 30, 2015.  At the time of the transfer to
Mr. Stern and BHI, the debtor still had remaining from the Mitsubishi
settlement a large amount of money 9 – money the debtor no longer had
by the time of the bankruptcy filing.  However, the debtor also had
corresponding debts in equivalent amounts.  In other words, there is
no reason to suppose the debtor's solvency status was any better on
October 14, 2015 than it was on the date of the bankruptcy filing.

    Finally, it appears likely the trustee will prevail on the final
element – that the transfer enabled Mr. Stern to receive more than he
would have received in a chapter 7 liquidation.  It is undisputed that
the transfer resulted in Mr. Stern receiving 100% of what he claims to
have been owed on account of the "long-term incentives" portion of his
compensation package under the Consulting Agreement.  As the trustee
points out, over $50 million in claims have been filed 10 and no one
suggests the trustee will collect and distribute anywhere near that

amount. Mr. Stern himself has filed claims totaling $6,558,044,
allegedly on account of a portion of the base compensation and
reimbursements of expenses he alleges are provided for in the
Consulting Agreement, as well as compensation he claims under an
earlier employment agreement. If the chapter 7 liquidation analysis
is to be made based on all of Mr. Stern's claims, rather than just the
"long-term incentives" compensation, the transfer enabled Mr. Stern to
receive almost 30% of the total amount of his claims.[11] Either way –
whether the transfer enabled Mr. Stern to receive 100% or only 30% of
what he would have received in a chapter 7 liquidation, the court
finds the trustee will likely be able to demonstrate the transfer
enabled him to receive more than he otherwise would have received in a
chapter 7 case.

        Mr. Stern's only argument on the issue of the likelihood of
success on the merits, as far as the preference claim is concerned
(aside from generalities about solvency and the overstatement of other
claims), is that the transfer was made in the ordinary course of
business. See § 547(c)(2) of the Bankruptcy Code. Mr. Stern cites
Wood v. Stratos Prod. Dev., LLC (In re Ahaza Sys.), 482 F.3d 1118 (9th
Cir. 2007), and in particular the court's consideration of testimony
regarding payments tied to specific dates or milestones in the life of
a start-up company. See Opp., at 6:4-11. Mr. Stern finds it
significant that, in the context of a start-up company, whose cash-
flow in the beginning is likely to be tight, the court held that
first-time transactions may qualify as ordinary-course transactions
for purposes of § 547(c)(2). 482 F.3d at 1125.[12] The court simply
finds the argument to be unpersuasive.

            With the "ordinary course of business" exception, Congress
        aimed not to protect well-established financial relations,
        but rather to leave undisturbed normal financial relations,
        because [the exception] does not detract from the general
        policy of the preference section to discourage unusual
        action by either the debtor or his creditors during the
        debtor's slide into bankruptcy. Together with the rule
        against preferential transfers, the ordinary course of
        business exception deters the "race to the courthouse" and
        enabl[es] the struggling debtor to continue operating its
        business. This animating policy concern is not erased
        simply because a debt is the parties' first transaction.
        Thus, as the BAP observed, it would be inconsistent with the
        purpose of the section for [the creditor] to be prevented
        from receiving the benefit of the ordinary course of
        business exception for otherwise routine transactions simply
        because [the creditor] never previously entered into a
        transaction with [the debtor].

Id. (citations omitted; internal quotation marks omitted).

        The court is not called upon at this time to determine whether
the transfer to Mr. Stern was an ordinary-course transaction, only to

determine the likelihood of the trustee prevailing on the issue. That said, the court would find it very difficult to construe the transfer as such. Importantly, the debtor was well along in its "slide into bankruptcy" by the time the transfer was made. No one suggests the transfer was made in an effort to enable the struggling debtor to continue operating its business. Mr. Stern himself admits that, as early as the time he and the debtor entered into the Consulting Agreement, in August of 2011, the company was "essentially defunct" and "had no business operations other than the prosecution of the Mitsubishi case." Opp. at 4:19-20.

Mr. Stern refers to the Consulting Agreement as having been entered into "in the ordinary course of that specialized business" (id. at 4:20-21), meaning the litigation. But even if the prosecution of litigation can be construed as the "ordinary course" of a company's business, the facts, at least as developed at this stage, do not support the conclusion that the transfer, as opposed to the creation of the debt, was either "made in the ordinary course of business or financial affairs of the debtor and the transferee" or "made according to ordinary business terms," as required by § 547(c)(2). On the contrary, the transfer was made the same day a special meeting of the board of directors was held, which Mr. Stern attended, at which the board "had a full discussion" of Mr. Stern's claim for payment of the $2.75 million, considered a motion to make the payment (a motion seconded by Mr. Stern), and then deadlocked on the issue (with Mr. Stern abstaining) and "tabled" the matter "to allow for Director [Richard] Gilbert to petition a court of competent jurisdiction for the appointment of a provisional director under California Corporations Code Section 308." Trustee's Ex. B, p. 6. The board also requested the debtor's corporate counsel to research and report back to the board on the question whether Mr. Stern was legally permitted to second the motion. In the meantime, the board voted unanimously to direct the debtor's counsel in the Mitsubishi action, Raymond Niro, "to hold the remaining Mitsubishi lawsuit settlement funds in his client trust account until further Board resolution" (id.) and continued the meeting to November 2, 2015.

There is no doubt the transfer to Mr. Stern was made no later than October 14, 2015. It is doubtful the transfer had already been made by the time of the meeting, at 3:15 p.m. on the afternoon of October 14. According to the minutes of the meeting, Mr. Stern attended the meeting, and the discussion of whether to pay him the $2.75 million would have been unnecessary if the transfer had already been made. If the transfer was made after the meeting was concluded, it very much appears it was made in direct contravention of the board's tabling of the matter until November 2 and its direction that Mr. Niro hold the remaining settlement funds.13 In short, whether the transfer took place before or after the meeting (and Mr. Stern does not clarify the matter), there was nothing "ordinary" about it. Nor was it "ordinary" that the transfer was made at Mr. Stern's direction into an account in a bank in Hong Kong – an account belonging to Mr. Stern and BHI, a company allegedly belonging to Mr. Stern and

organized under the laws of the British Virgin Islands. These facts
alone suggest an intention to make it difficult for the debtor or its
creditors to access the funds if the board later voted not to approve
the payment.

The minutes of the October 14 meeting also show that when the
transfer was made, Mr. Stern and the other directors knew there were
significant doubts as to the sufficiency of the remaining Mitsubishi
proceeds to meet the debtor's liabilities. At the meeting – the
meeting at which the board deadlocked on the issue of Mr. Stern's
$2.75 million payment, the board discussed the possibility of the
debtor filing a bankruptcy proceeding and the board's intent "to enter
into agreements with Mr. Niro and [the debtor's litigation financing
company] to further negotiate in good faith a reduction of their
respective fee claims" (Ex. B, p. 5), as well as "the need to appoint
point persons to negotiate with the [debtor's] remaining creditors any
claims they may have." Id. It was against this backdrop that the
transfer to Mr. Stern was made. Again, there was nothing ordinary
about it.[14]

For the reasons stated, the court finds the trustee is likely to
prevail on the merits of his preference claim, and that factor weighs
in favor of granting the motion. Having reached this conclusion, the
court has no need to consider the merits of the trustee's fraudulent
transfer or turnover claims.[15]

## II.  Likelihood of Irreparable Harm

Mr. Stern begins by citing authority from outside the Ninth
Circuit for the proposition that a preliminary injunction should not
issue where the plaintiff may be adequately compensated for her loss
by monetary damages. However, the Ninth Circuit has expressly held a
preliminary injunction may issue in fraudulent transfer actions and
actions seeking other equitable relief. Rubin v. Pringle (In re Focus
Media Inc.), 387 F.3d 1077, 1085 (9th Cir. 2004). "[W]hen the
plaintiff creditor asserts a cognizable claim to specific assets of
the defendant or seeks a remedy involving those assets, a court may in
the interim invoke equity to preserve the status quo pending judgment
where the legal remedy might prove inadequate and the preliminary
relief furthers the court's ability to grant the final relief
requested." Id., quoting United States ex rel. Rahman v. Oncology
Assocs., 198 F.3d 489, 496 (4th Cir. 1999); see also Sharp v. Salyer
(In re SK Foods, L.P.), 2010 U.S. Dist. LEXIS 136178, *16 (E.D. Cal.
2010) [citing Focus Media as supporting issuance of preliminary
injunction in action alleging fraudulent transfers and preferences].

Next, Mr. Stern contends the trustee has not shown a likelihood
of irreparable harm to the estate if a preliminary injunction is not
issued. He claims the harm is "entirely theoretical" (Opp. at 13:15)
because the funds in the account are already frozen and the trustee's
concern is simply that "at some unknown time in the future, the
accounts may become unfrozen." Id. at 13:16-17. He continues: "But

even then, [the trustee] does not allege that the funds will be dissipated or that Mr. Stern will not have the ability to meet any judgment in the unlikely event [the] Court enters judgment against him." Id. at 13:17-29. The court disagrees with Mr. Stern's conclusions about the likelihood of harm to the estate.

The transfer of the funds to the Mr. Stern/BHI account in the first place, apparently made immediately after the board had voted, at a meeting attended by Mr. Stern, not to approve the payment at that time weighs against Mr. Stern in the analysis. His present argument and testimony about what transpired at the meeting hurts him more than it helps. He admits he was at the meeting and that the board deadlocked on the issue of the payment. Despite that deadlock, Mr. Stern insists the Consulting Agreement was valid and enforceable according to its terms and that no further vote on the payment was necessary. He claims Mr. Niro was also of that opinion. "It is true that, on October 14, the Board of Directors 'deadlocked' on whether to authorize payment to Stern. But the undisputed facts are that no further vote by the Board was necessary, because it had previously approved the Stern Consulting Agreement, and Niro believed the assignment to Stern of $2.75 million to be valid and proper." Opp. at 3:14-18. Phrased another way, "[t]he Board deadlocked on whether to take any action one way or another with respect to the transfer, so the Consulting Agreement stood, and the transfer was made." Id. at 8:27-28.

In other words, Mr. Stern relied on his own conclusion as to the legality and propriety of the transfer knowing full well the board had voted to table the issue to a later date and knowing the board had also voted to direct Mr. Niro to hold the remaining settlement funds in his client trust account "until further Board resolution." It is doubtful Mr. Niro was aware of that further vote – the trustee has submitted evidence, undisputed factually by Mr. Stern although challenged on evidentiary grounds, that Mr. Niro left the meeting before the motion was made to approve the payment to Mr. Stern. See Trustee's Ex. C. Thus, Mr. Stern's present argument suggests he took advantage of the fact that Mr. Niro had left the meeting early to persuade him to make the transfer despite the board's later vote.16

If that alone is not enough, however, Mr. Stern later transferred substantial amounts out of the account in the face of the debtor's then-corporate counsel's demand that he return the entire amount. On October 20, 2015, the debtor's then-corporate counsel, Timothy Charshaf, wrote (in a letter sent by email) to Mr. Niro and attorney John Oehmke, identified earlier in this litigation as having at one time represented Mr. Stern (see DN 27), stating he had discovered in Mr. Niro's accounting of payments made from the Mitsubishi proceeds a $2.75 million payment to Mr. Stern. Mr. Charshaf described in detail what had transpired at the October 14 board meeting with respect to that payment. He concluded that "[t]he [Mitsubishi] settlement funds belong to Grail and can only be disbursed pursuant to Grail's direction" (Trustee's Ex. C) and asked the parties to work toward the

return of all of the money to Mr. Niro's trust account.  On October
29, Mr. Charshaf wrote again to Mr. Oehmke, as counsel for Mr. Stern,
"demanding" the return of the $2.75 million "wrongfully disbursed from
Mr. Niro's account to your client after the October 14, 2015 Board of
Directors meeting."  Trustee's Ex. D.  Mr. Charshaf referred to Mr.
Stern's conduct in initiating the transfer in terms of Mr. Stern's
fiduciary duties to minority shareholders and the corporation and
suggested his conduct could be interpreted as "an intentional
conversion of a substantial corporate asset for his own personal
gain."  Id.

     Despite those letters, substantial funds were transferred out of
the Hong Kong account:  $90,000 to MOM on October 20 and $100,000 to
Mr. Stern on October 26.  Then, despite the intervening bankruptcy
filing on December 30, $310,000 was transferred to MOM on January 14,
2016, $100,000 to Mr. Stern on February 26, and $250,000 to Frank
Bauder, a creditor and former director of the debtor (and a defendant
opposing this motion), on February 26.  These transfers were almost
certainly made at Mr. Stern's direction; in any event, he does not
suggest anyone else directed them.[17]  Further, it appears the funds
have been commingled with other funds of BHI.[18]

     As already discussed, the court has, since then, issued a right
to attach order in the trustee's favor.  The trustee testifies she has
employed special counsel in Hong Kong but understands Hong Kong might
not enforce the order and if it did, it would be at great expense.[19]
In addition, the trustee "understand[s] that the account . . . is
currently administratively frozen, but [the Bank] contends it can lift
the freeze at any time."  S. Carello Decl., DN 141, at 7:17-18.  In
response to Mr. Stern's opposition, the trustee's counsel, Mr.
Cunningham, testifies the Bank's counsel has told him the funds have
been frozen.  However, the Bank's counsel "(a) declined to disclose
the amount that remains on deposit; (b) declined [Mr. Cunningham's]
request for assurance that the freeze would remain in place absent an
order of a court of competent jurisdiction; and (c) continued to
dispute the jurisdiction of this Court's June 30, 2016 right to attach
order."  R. Cunningham Decl., DN 160, at 3:23-26.  Mr. Cunningham adds
it is his understanding that since attachment is not a remedy in Hong
Kong, the Hong Kong courts are not likely to enforce the right to
attach order but are more likely to enforce an order granting this
motion.

     Given this testimony and Mr. Stern's decision to initiate the
transfer out of this country in the first place in the face of the
board's deadlock on the issue and to transfer funds out of the account
in the face of the debtor's then-corporate counsel's demand for their
return, the court is satisfied there is a likelihood of irreparable
harm to the estate if a preliminary injunction is not issued.

III.  Balance of the Equities

     If the Hong Kong courts will not enforce the right to attach

order and if Mr. Stern transfers the remaining funds out of the account, the estate may well be left with nothing but the prospect of more litigation. Mr. Stern cites nothing on the opposite side of the scale; that is, nothing suggesting any harm would come to him if the injunction is not issued. Instead, he argues in general terms that the trustee has not shown in detail what injury she would suffer in the absence of an injunction and has not shown a likelihood of success on the merits. Thus, he concludes, "there is no justification for interfering with Defendants' rights." Opp. at 14:9-10. The court finds to the contrary: that the equities heavily favor the trustee.

## IV.  The Public Interest

Here, again, Mr. Stern offers nothing but generalities. He contends that, while the protection of assets of a bankruptcy estate for creditors and the prevention of fraudulent transfers are in the public interest, those interests must be balanced against "the public's interest in the protection of private property rights and the prevention of abuse of this Court's process." Opp. at 14:16-17. Mr. Stern offers no particulars on his side of the scale. His opposition overall leaves the very strong impression Mr. Stern believes he was and is entitled to the compensation he alleges is represented by the transfer, and therefore, believes the trustee will not prevail on the merits. But his argument virtually ignores the elements of the trustee's preference claim and relies exclusively on a doubtful defense. In the meantime, Mr. Stern apparently simply wants to preserve his access to the funds in Hong Kong to the extent possible and to prevent the trustee from preserving those assets for the benefit of other creditors. Here again, the public interest favors the trustee.

In sum, the court is to evaluate the four Cottrell factors under a "sliding scale" approach: thus, "'serious questions going to the merits' and a balance of hardships that tips sharply toward the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." Cottrell, 632 F.3d at1135. Here, the court has no trouble concluding that there are serious questions going to the merits. Further, the balance of the equities tips sharply in the trustee's favor. The latter two elements are satisfied as well, and the motion will be granted. The court will hear the matter.

---

1    For the sake of simplicity, the court may on occasion in this decision refer to the opposing defendants collectively as "Mr. Stern." The opposition does not distinguish among their interests.

2    The trustee has submitted 270 pages of exhibits with her reply to the opposition. The defendants objected in advance to what they predicted would be "a plethora of documents and other evidence

not provided in support of the motion." Defendants' Opp., DN 150 ("Opp."), at 2:5. The court finds it need not consider the reply exhibits or the reply declaration of the trustee's counsel, but for paragraph 11 of the declaration, discussed below, which the court finds to be an appropriate reply to the defendants' opposition and not new evidence that should have been submitted with the motion.

3    For example, they read "Fed. R. Evid. 602 - No personal knowledge," "Fed. R. Evid. 801, 802 - Hearsay," and so on.

4    For example, objection 20 to the trustee's declaration states under Contradictory Facts, "To the contrary, Stern believed [the] settlement funds were enough to meet the debtor's obligations." Defendants' Evid. Objs., DN 153 ("Evid. Objs."), ¶ 20. Mr. Stern makes no such statement in his declaration and in fact, the defendants state in their opposition with respect to the 5% that was due to another director, Ronald Hofer, under his consulting agreement with the debtor, that "at the time of settlement, Mr. Niro [the debtor's counsel] told him in no uncertain terms that, given the insufficiency of the proceeds to satisfy all claims, he was not being included." Opp. at 6:21-22 (emphasis added).

5    See Sharp v. SKMP Corp. (In re SK Foods, L.P.), 2011 Bankr. LEXIS 5651, *72-75 (Bankr. E.D. Cal. Oct. 11, 2011) and cases cited therein.

6    It appears from her declaration and Exhibit E in support of this motion the trustee now believes the transfer was made on October 14, 2015. The date of the transfer is significant, although not dispositive, as discussed below.

7    See § 547(b) of the Bankruptcy Code and Adams v. Anderson (In re Superior Stamp & Coin Co.), 223 F.3d 1004, 1007 (9th Cir. 2000).

8    Mr. Stern states in the Contradictory Facts section of his evidentiary objections, "The Debtor was not insolvent." Evid. Objs., ¶ 34. However, as seen in note 4, above, Mr. Stern's own opposition belies that conclusion. Mr. Stern also objects to the trustee's testimony that Brad Woods had told her the transfer was made while the debtor was insolvent. The testimony is, of course, hearsay. But the court reaches its conclusion based on the debtor's schedules, as follows, of which the court can and does take judicial notice.

9    For example, according to the debtor's amended statement of financial affairs, the debtor paid 1st Class Legal (IS) Limited $14,600,000 on October 16, 2015, two days after the transfer to Mr. Stern and BHI.

10    Mr. Stern objects that the claims are "grossly overstated" (Evid. Objs., ¶ 2) but does not suggest which ones or in what amounts

and he offers no evidence.

11   Adding the $2.75 million "long-term incentives" claim to Mr.
     Stern's other claims brings the total to $9,308,044.   The amount
     of the transfer, $2.75 million, is 29.5% of that total.

12   The applicability of the holding to the present case is
     questionable.   Mr. Stern testifies he and his cousin incorporated
     the debtor as a start-up company in January of 2000, over 11
     years before the Consulting Agreement was signed and over 15
     years before the transfer was made.

13   The minutes show Mr. Niro as having attended the meeting, but a
     subsequent letter from the debtor's corporate counsel to Mr. Niro
     and another attorney indicates Mr. Niro left the meeting before
     the motion was made to authorize the payment to Mr. Stern.   The
     letter also states Mr. Stern attended the entire meeting.

14   In addition, it is undisputed that by October of 2015, there was
     pending litigation between or among the debtor, Mr. Stern, his
     cousin Robert Stern, and an individual named Ronald Hofer, who
     had also been made a board member.   The existence of all of these
     disputes further lessens the credibility of the notion the
     transfer to Mr. Stern was made in the ordinary course of business
     or according to ordinary business terms.

15   The court will add the following, however.   Concerning the
     trustee's fraudulent transfer claims, Stern argues that certain
     language in the Consulting Agreement operated to create a
     perfected assignment to Stern of an interest in the Mitsubishi
     proceeds.   Stern has provided a very limited analysis, but in any
     event, the court has considered the cited language and finds it
     not even facially sufficient to create a perfected assignment of
     a portion of the proceeds.

16   Mr. Stern does not address the later vote – the one that Mr. Niro
     be directed to hold the remaining funds pending a further vote,
     although the trustee's evidence is that Mr. Stern was present at
     the entire meeting (Ex. C) and Mr. Stern does not deny that.   His
     testimony is carefully worded and, in the court's view, weighs
     against him:   "I was never formally notified that the Consulting
     Agreement with me was not valid and enforceable according to its
     terms.   At no time did Grail ever give me notice that it did not
     intend to perform, whether lawful or otherwise.   Moreover, no
     explanation was given to me as to why the matter was put to a
     vote of the Board on October 14, 2015."   D. Stern Decl., DN 151,
     at 4:27-5:2.   The court considers the board's votes on October 14
     – to table the issue of the payment and request legal research on
     the matter and to direct Mr. Niro to hold the remaining funds –
     to have been formal notice that Mr. Stern ought not take matters
     into his own hands.   The fact that he did so, together with his
     subsequent transfers, discussed below,  suggests he would do so

again.

17    Mr. Stern objects to the trustee's testimony identifying those
      transfers and to the Bank email confirming them, the trustee's
      Ex. E, on a variety of grounds, including lack of personal
      knowledge, hearsay, and, notably, under Fed. R. Evid. 403, unfair
      prejudice, confusion, misleading, and a "waste of time." He also
      objects that the Bank's email was "privileged and confidential"
      and "without any certified correct or verified corporate or
      banking documents" (Evid. Objs., ¶ 40), and he suggests Brad
      Woods "may have created this document just to attack Stern." ¶
      42. He adds that the email "does not support the transfers
      alleged in the foregoing paragraph" (¶ 41); however, the dates,
      amounts, and transferees are listed in the email. Mr. Stern does
      not suggest, let alone testify, that the transfers out of the
      Hong Kong account were not made. See <u>Gonzalez v. Wells Fargo
      Bank</u>, 2009 U.S. Dist. LEXIS 101036, *7 (N.D. Cal. 2009)
      [addressing evidentiary objections on motion for preliminary
      injunction: "[B]ecause Gonzalez does not suggest that any of the
      documents are anything other than what they purport to be, the
      court sees no reason to presume otherwise."].

18    In his evidentiary objections, Mr. Stern states, "Funds received
      by BHI from Niro were comingled [sic] with other funds as the BHI
      company had been in operation since Woods set it up in 2012."
      Evid. Objs., ¶ 38.

19    Mr. Stern objects to this testimony on the usual variety of
      evidence rules, drawing the unsupported conclusion that there is
      "[n]o reason Hong Kong would not recognize [the] order." Evid.
      Objs., ¶ 62. However, Fed. R. Civ. P. 44.1, incorporated herein
      by Fed. R. Bankr. P. 9017, permits the court, "[i]n determining
      foreign law, [to] consider any relevant material or source,
      including testimony, whether or not submitted by a party or
      admissible under the Federal Rules of Evidence." Thus, the court
      considers the trustee's testimony, together with Mr. Cunningham's
      testimony, below, concerning his conversation with the Bank's
      lawyer.

# Instructions to Clerk of Court
## Service List – Not Part of Order/Judgment

The Clerk of Court is instructed to send the Order/Judgment or other court generated document transmitted herewith to the parties below. The Clerk of Court will send the Order via the BNC.

| | | |
|---|---|---|
| Sheri L. Carello<br>PO Box 22527<br>Sacramento CA 95822-0527 | Mom OS, LLC<br>Monaco Garden Tower<br>1924 Domina St, Pasay City<br>REPUBLIC OF THE PHILIPPINES<br>Metro Manila | Billion Hope International Limited<br>Monaco Garden Tower<br>1924 Domina St, Pasay City<br>REPUBLIC OF THE PHILIPPINES<br>Metro Manila |
| Donald Stern<br>Monaco Garden Tower<br>1924 Domina St, Pasay City<br>REPUBLIC OF THE PHILIPPINES<br>Metro Manila | Deutsche Bank National Trust Company<br>Robertson, Anschutz & Schneid, P.L.<br>Bankruptcy Department<br>6409 Congress Ave #100<br>Boca Raton FL 33487 | April Harriott<br>6409 Congress Ave #100<br>Boca Raton FL 33487 |
| Iain A. Macdonald<br>221 Sansome St<br>San Francisco CA 94104 | J. Russell Cunningham<br>1830 15th St<br>Sacramento CA 95811 | Mark M. Sharf<br>5950 Canoga Ave #400<br>Woodland Hills CA 91367 |
| Matthew J. Olson<br>914 Thirteenth Street<br>Modesto CA 95354 | Michael R. Hogue<br>4 Embarcadero Center #3000<br>San Francisco CA 94111 | |